**INTERNATIONAL BANK FOR RECON-
STRUCTION AND DEVELOP-
MENT, Plaintiff,**

v.

**DISTRICT OF COLUMBIA, Defendant.**

No. CIV. A. 97–1158(GK).

United States District Court,
District of Columbia.

Feb. 25, 1998.

Albert G. Lauger, Jr., Lloyd H. Mayer, Caplin & Drysdale, Chartered, Washington, DC, for Plaintiff.

Richard G. Amato, Corporation Counsel, Washington, D.C., Vincent M. Garvey, Delicia L. Chambers, Federal Programs Branch, Civ. Div., Dept. of Justice, Washington, DC, for Defendant.

Lester Nurick, Wilmer, Cutler & Pickering, Washington, DC, for Amici.

*MEMORANDUM OPINION*

KESSLER, District Judge.

Plaintiff, the International Bank for Reconstruction and Development (the "World Bank" or the "Bank"), brings this action under the Articles of Agreement of the International Bank for Reconstruction and Development, Dec. 7, 1945, 60 Stat. 1440, 2 U.N.T .S. 134, as amended, Dec. 17, 1965, 16 U.S.T.1942 (codified as amended at 22 U.S.C. §§ 286–286mm (1994)) (the "Articles of Agreement"), to recover monies paid to the Defendant District of Columbia to satisfy tax-deficiency assessments levied against Plaintiff's cafeteria operations. This matter is before the Court on the parties' cross-motions for summary judgment ("Pl.'s Mot.") [# 17] and ("Def.'s Cross–Mot.") [# 16].

Upon consideration of Plaintiff's Motion, Defendant's Cross–Motion, and the entire record herein, for the reasons discussed below, Plaintiff's Motion is **granted**, and Defendant's Cross–Motion is **denied**.

## I. BACKGROUND [1]

The facts of this case are not disputed. The World Bank is an international, inter-governmental organization composed of 180 members, including the United States. The primary purposes of the World Bank, include *inter alia*, providing financial assistance for the restoration and development of territories of member countries, and promoting private foreign investment and the balanced growth of international trade. (*See* Art. 1 of Articles of Agreement, attached as Pl.'s Ex. C.) Plaintiff's principal office in the United States is located in Washington, D.C. (Statement ¶ 1.)

The World Bank currently employs nearly 9,000 persons, including citizens from over 130 countries, who work in the Bank's headquarters and in 97 resident missions outside the United States. (*Id.*) The World Bank's Articles of Agreement confer upon it an international and intergovernmental status independent of any individual member country and broad tax immunities. All member countries, including the United States, have adopted the Bank's governing Articles of Agreement.

In 1960, Plaintiff established a Food Service Program ("Program") at its principal office to provide dining facilities for the exclusive use of its staff, official visitors, and invited guests. (Statement ¶ 5.) Since 1970, the Bank has engaged outside caterers to operate the Program. (Statement ¶ 5.) During 1993–1995, Plaintiff contracted with Gardner Merchant Food Services, Inc. ("Gardner Merchant") to perform services under the Program. (*Id.* at ¶ 6; *see also* service contract between Plaintiff and Gardner Merchant ("Contract"), attached as Pl.'s Ex. I.) Since the inception of the Program, the District has never collected nor has Plaintiff ever paid sales and use taxes for purchases of food or any other supplies used for the Program, or on sales of meals at the World Bank's cafeterias and dining rooms. (Statement ¶ 7.)

Under the Contract, Gardner Merchant agreed to provide various cafeteria services in accordance with the guidelines of Plaintiff's Operating Specifications for Food Service Facilities ("Operating Specifications"), which describes in great detail the duties and operations of a food-service contractor and the manner in which they must be performed. For example, the Operating Specifications dictate appropriate menus, pricing, hours of operation, sanitation, and employment practices. (*See* Contract Art. 7.1 and Annex A.) Gardner Merchant was subject to daily quality-assurance audits to ensure that it was complying with all of the Bank's requirement, policy and contract specifications. (Statement ¶¶ 10–11.) The Bank rigorously supervised and controlled every aspect of the Program's operations. (Statement ¶ 11; Pl.'s Ex. H ¶ 6.)

Pursuant to Article 6 of the Contract, Gardner Merchant agreed to perform the

---

**1.** Pursuant to Local Rule 108(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." The Court thus takes these facts from Plaintiff's Statement of Material Facts Not in Dispute ("Statement").

contracted for services on "a profit-and-loss basis, e.g., after Contractor receives and records all sources of revenues, it will pay out all expenses, and any resultant losses will be the Contractor's responsibility." (Contract Art. 6.1.) In addition, Gardner Merchant agreed to pay Plaintiff any profits exceeding two percent of its total revenues. (*Id.* at Article 6.1.1.) Section 4.12 of the Operating Specifications provides the accounting methods to be followed by Gardner Merchant, and reserves to Plaintiff the authority to approve or disapprove various items of operating expense. (*See* Pl.'s Ex. I.)

The World Bank assured Gardner Merchant that it was immune from the duty to collect or pay any sales or use taxes because of the Bank's tax-immune status. (*Id.* at Art. 8.) In particular, Plaintiff agreed to furnish Gardner Merchant any required tax-exemption certification to relieve it of any duties to collect or pay sales or use taxes related to its transactions under the Contract. The provision in the contract indicating that Gardner Merchant could assert the Bank's immunity was consistent with prior practice of the Food Service Program. (Statement ¶ 8 and Ex. I, Art. 8.1.) As a result, Gardner Merchant did not collect or pay Defendant any sales or use taxes related to transactions under the Program, such as sales of meals and purchases of supplies. (Statement ¶ 8.)

Defendant's Department of Finance and Revenue (the "Department") performed a general sales and use tax audit on Gardner Merchant for the period of January 1, 1994 through December 31, 1995, and issued a notice of deficiency. The notice mainly related to transactions dealing with the World Bank. (Statement ¶ 12.) The Bank and Gardner Merchant contested the notice of deficiency through written submissions and a hearing before a Hearing Officer of the Department. (Statement ¶ 13.) On November 22, 1996, the Department assessed sales and use taxes against Gardner Merchant in the amount of $688,737.61. The Department did not provide a rationale for its decision. (Statement ¶ 14.)

On May 22, 1997, Plaintiff paid Defendant approximately $680,195 to satisfy that portion of the assessment related to Gardner

Merchant's Program transactions. (Statement ¶ 16.) The amount paid by the Bank consists of approximately $347,039 in taxes, $156,167 in penalties, and $176,990 in interest. (*Id.*) The parties agree that Plaintiff overpaid approximately $25,818 in interest. (*See* Pl.'s Mot. at 9; Def.'s Cross–Mot. at 2.) Accordingly, the amount in controversy in this case is $654,378.

## II. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted only if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*, 477 U.S. at 255. In this case, both parties agree that the case may be disposed of on summary judgment.

## III. Neither The World Bank, Nor Its Independent Contractor, Is Liable For Sales Or Use Taxes Assessed On The Operation Of Its Food Service Program.

This case raises significant issues of first impression. The primary question is whether the immunity from taxation granted to Plaintiff under the Articles of Agreement extends to Plaintiff's independent contractor who operates Plaintiff's cafeteria and pays Plaintiff a stated percentage of gross revenues.

Plaintiff's broad tax-immune status is set forth in Article VII, Section 9(a) of the Articles of Agreement, which provides,

> The Bank, its assets, property, income and *its operations and transactions* authorized by this Agreement, *shall be immune from all taxation* and from all customs duties. *The Bank shall also be immune* from liability for the *collection or payment of any tax* or duty.

(emphasis added) *codified at* 22 U.S.C. § 286h (1994) ("[Section 9 of the Agreement] shall have full force and effect in the United States ...."). The District of Columbia has conceded that it is bound by the immunity provision of the World Bank pursuant to 22 U.S.C. § 286h. (*See* Amended Compl. ¶ 7, attached as Pl.'s Ex. A; Ans. to Amended Compl. ¶ 7, attached as Pl.'s Ex. B.)

Plaintiff does not deny that Gardner Merchant is a separate and independent entity. Plaintiff argues, instead, that the "operations and transactions authorized by [the] Agreement" include the Food Service Program operated by its independent contractor. (*See* Pl.'s Mot. at 19–26.) Accordingly, the World Bank maintains that because the Food Service Program is a legally authorized operation and/or transaction of the institution, and because that Program may be operated through independent contractors, any such contractor is immune from liability for collecting or paying any taxes connected with the Program. (*Id.*)

Defendant, on the other hand, contends that Gardner Merchant's transactions connected with the Program are subject to sales and use taxes under various provisions of the District of Columbia Sales Tax Act. (*See* Def.'s Cross–Mot. at 4 (citing D.C.Code § 47–2001).) Defendant argues that, because Gardner Merchant operated on a profit-and-loss basis, as opposed to a flat fee, it was not acting as Plaintiff's agent and hence does not fall under Plaintiff's "cloak of immunity". (*Id.* at 5.) Defendant further argues that Gardner Merchant is not distinguishable from any other food vendors operating in the District of Columbia simply because it operates on Plaintiff's premises. (*See* Def.'s Opp'n at 4.)

**A. Operation of the Food Service Program is included within the "operations and transactions" for which the World Bank is granted tax immunity**

The World Bank is governed by its Articles of Agreement and its Bylaws. Under Article V, each member state of the World Bank appoints a Governor to the Bank's Board of Governors, which in turn selects twenty four Executive Directors to oversee its operations. (*See* Articles of Agreement, Pl.'s Ex. C., at Art. V, § 4.) Article V further provides that the Executive Directors shall appoint a President, who shall act as Plaintiff's chief operating officer and conduct Plaintiff's ordinary business. (*Id.* at Art. V, § 5(b).) The President's duties include, *inter alia*, submitting to the Executive Directors proposed annual administrative budgets which detail the expenses associated with the Bank's ordinary business. (*See* By-laws of the International Bank for Construction and Development ("By–Laws"), attached as Pl.'s Ex. E., at § 18(b).)

Individual member countries are required to refrain from any attempts to influence the internal operations of the Bank. (Articles of Agreement, Art. V, Section 5(c)) ("Each member of the Bank shall ... refrain from all attempts to influence any [employees or officers of the Bank] in the discharge of their duties"). The prohibition against interference into the internal affairs of the World Bank extends to any interference caused by domestic law and regulations of member countries.[2]

The D.C. Circuit has recognized that the immunities accorded international organizations from the domestic laws of member states is "rooted in the need to protect international organizations from unilateral control by a member nation over the activities of the international organization within its territory." *Mendaro v. World Bank*, 717 F.2d 610, 615 (D.C.Cir.1983) (U.S. law not applicable to employment discrimination claims of World Bank employees); *see also Morgan v. International Bank for Reconstr. & Dev.*, 752 F.Supp. 492 (D.D.C.1990)(dismissing tort action against World Bank brought by former employee of an employment agency assigned to work at the Bank).

In addition to providing immunity to the Bank from expropriation of its assets or property, and protecting officers and employ-

---

**2.** Information provided at the request of the Court regarding the tax status of independent contractors providing food services for other international organizations either inside the United States, or outside the United States under similar circumstances proved not to be dispositive.

ees of the Bank from legal process regarding acts performed in their official capacity, the Articles of Agreement grant broad immunity from taxation. (*See* Art. VII.) This broad tax immunity is necessary to prevent member countries from imposing financial or administrative burdens on international organizations, and to prevent a member country from securing financial advantage by requiring the organization to pay taxes itself or collect taxes from others. *See* Edwin H. Fedder, *The Functional Basis of International Privileges and Immunities*, 9 Am. Univ. L.Rev. 60, 64 (1960)(stating that immunity from taxation "is indispensable if the [international] organizations are to be permitted to remain independent from national control, supervision, interference or impedimenta of various types").

The question remains whether the scope of Plaintiff's authorized "operations and transactions" extends to the tax assessed by Defendant against Gardner Merchant. Neither the Articles of Agreement nor the By–Laws specifically include or refer to the Food Service Program as part of the Bank's ordinary business. Instead, the Articles of Agreement provide generally that the President "shall be responsible for the organization, appointment and dismissal of the officers and staff." (Articles of Agreement, Pl.'s Ex. C., at Art. V, § 5(b).) It would make no sense to give the President responsibility for the "organization ... of the officers and staff", but deny him the authority to provide for the daily food needs of that staff. The provision of on-site eating facilities is particularly necessary given the frequency of official visitors and invited guests from all over the world as well as the diverse dietary needs of its many foreign employees.

In short, Plaintiff's ordinary "operations and transactions" can reasonably be interpreted to include the provision of cafeteria and dining room services to employees and invited guests. Furthermore, Defendant concedes that if Plaintiff operated the Program through its own employees, it would certainly be immune from the duty to collect or pay any sales or use tax. *See* 22 U.S.C. § 286h. Whether to operate the Program by employees or by independent contractors is

an internal administrative decision of the World Bank. Its members cannot interfere with or try to influence that decision in any way, including the imposition of sales or use taxes on the Program.

■ Even if there was uncertainty about the scope of the Bank's tax immunity, this interpretation is consistent with customary international law, under which an international treaty should be liberally construed to effectuate its purposes. *See, e.g., Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 535, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) ("treaties are construed more liberally than private agreements") (citations omitted); *see also, United States v. Stuart,* 489 U.S. 353, 368, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) ("[W]here a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred, ....") (quoting *Bacardi Corp. of Am. v. Domenech,* 311 U.S. 150, 163, 61 S.Ct. 219, 85 L.Ed. 98 (1940) (internal quotations omitted)).

This interpretation finds support in rulings by the Internal Revenue Service (the "IRS") in two analogous situations. First, in 1960, the IRS ruled the Bank immune from the manufacturers' and retailers' excise taxes imposed by Chapters 31 and 32 of the Internal Revenue Code (the "Code"). (IRS Private Letter Ruling dated Nov. 25, 1960, attached as Pl.'s Ex. F.) The IRS reached this conclusion even though it recognized that the legal incidence of these taxes falls on the retailer or manufacturer, not on the Bank. (*Id.*) Viewing the legal incidence of these taxes as irrelevant, the IRS stated that "in view of the fact that the tax immunity provided in section 9(a) of the Articles is authorized by international treaty, a liberal interpretation of that section to effect the purposes of the member Governments is required as a matter of international contractual agreement." *Id.* at 3.

Second, in 1988, the IRS ruled that
[n]either the Bank nor an agent appointed by it for the purpose of paying interest on or purchasing or redeeming securities issued by the Bank is required to withhold tax under sections 1441 and 1442 of the

Code on interest ... paid by the Bank or on the redemption of its securities, regardless of the source of income, based upon section 9(a) of Article VII of the Agreement.

(IRS Private Letter Ruling dated May 4, 1988, attached as Pl.'s Ex. G.) Thus, in these two analogous, albeit not identical, situations the IRS has construed the tax immunity at issue here to exempt third parties from tax liability for transactions with or on behalf of the World Bank.

In this case, Plaintiff's Food Service Program must be deemed to fall within the scope of Plaintiff's "ordinary business" as set forth in the Articles of Agreement. Providing meals and dining facilities to Plaintiff's employees and guests, on Plaintiff's own premises, is neither extraordinary nor unrelated to carrying out Plaintiff's purpose. Rather, as our Court of Appeals has acknowledged, the "United States has accepted without qualification the principles that international organizations must be free to perform their functions and that no member state may take action to hinder the organization." *Broadbent v. Organization of American States*, 628 F.2d 27, 34 (D.C.Cir.1980) (citing XIII Documents of the United Nations Conference on International Organizations 704–05 (1945) *reprinted in* 13 Whitman, Digest of International Law 36 (1968)). For all these reasons, the World Bank's Food Service Program and its related transactions, are properly considered part of Plaintiff's "ordinary business", and therefore fall within the scope of Plaintiff's authorized "operations and transactions" which are "immune from all taxation".[3]

**B. Nothing in the Articles of Agreement precludes tax-exempt status for an independent contractor operating the Food Service Program for the World Bank.**

Defendant argues that, even assuming Plaintiff could itself operate the Food Service Program with immunity from taxation, such immunity does not extend to Gardner Merchant, an independent contractor. (*See* Def.'s Cross–Mot. at 11.) Defendant contends that because Gardner Merchant and the World Bank are entirely separate entities, taxing Gardner Merchant is appropriate. Further, the World Bank is "out of the loop" of the statutory scheme embodied by the Act. (*Id.* at 8.) Defendant maintains that taxing Gardner Merchant was appropriate because Gardner Merchant had a duty to collect the tax; the legal incidence fell on the purchaser of the food; and the World Bank's tax immunity was not involved in the transactions taxed by the District. (*Id.*)

Defendant relies, by analogy, on cases that address the tax status of federal contractors, who may claim immunity from taxes only under certain narrow circumstances, to argue that the instant case does not fit within those narrow exceptions. Federal contractors who derive their immunity from the United States, may claim such immunity from state taxes only "when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned." *United States v. New Mexico*, 455 U.S. 720, 735, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982); *see also United States v. District of Columbia*, 669 F.2d 738, 744 (D.C.Cir.1981) (citing *Alabama v. King & Boozer*, 314 U.S. 1, 12, 62 S.Ct. 43, 86 L.Ed. 3 (1941)).

The immunity of the United States from state taxation is implied from the Supremacy Clause of the Constitution. *See District of Columbia*, 669 F.2d at 742 (citing *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819)). The immunity of the World Bank, by contrast, is explicitly set forth in an international agreement that has been executed and codified by Congress. *See* 22 U.S.C. § 286h (executing Article VII, § 9 of the Articles of Agreement). The two types

---

**3.** In *Mendaro*, 717 F.2d at 615, the Court of Appeals cited with approval the principle enunciated in the Restatement of the Foreign Relations Law of the United States (Revised) § 464(1)(Tentative Draft No. 4)(1983) that "an international organization is entitled to such privileges and such immunity from the jurisdiction of a member state as are necessary for the fulfillment of the purposes of the organization, including immunity from legal process, from financial controls, taxes and duties."

of immunity—one implied from the Constitution and the other expressly created by statute—do not share the same set of limitations. *See Carson v. Roane–Anderson Co.*, 342 U.S. 232, 234, 72 S.Ct. 257, 96 L.Ed. 257 (1952); *see also New Mexico*, 455 U.S. at 737 ("If the immunity of federal contractors is to be expanded beyond its narrow constitutional limits, it is Congress that must take responsibility for the decisions, . . .").

In *Carson*, contractors of the Atomic Energy Commission ("Commission") sought to recover sales and use taxes which had been paid under protest to the State of Tennessee. 342 U.S. at 233. Under the Atomic Energy Act of 1946, the Commission and its "activities" were expressly exempted from taxes of any kind. *Id.* (citing 42 U.S.C. § 1809(b), *amended by* 42 U.S.C. § 2011 *et seq.* (1954)). The Supreme Court interpreted the Commission's statutory immunity to include activities performed by independent contractors. *Id.* at 236. The Supreme Court reasoned that Congress has the power to broaden the Commission's tax immunity beyond the scope of immunities that may be implied from the Constitution and concluded that "[t]he meaning of 'activities'. . . may be broad enough to include what is done through independent contractors as well as through agents." *Id.* Accordingly, the independent contractors in *Carson* were held to be immune from state use or sales taxes connected to the Commission's activities. *Id.*

In this case, Congress, by enacting the treaty governing the World Bank, has explicitly exempted the Bank's "operations and transactions" from taxes of any kind. *See* 22 U.S.C. § 286h. Applying *Carson* by analogy, the scope of Plaintiff's "operations and transactions" extends to all aspects of Plaintiff's activities, including those carried out by Plaintiff's independent contractor. The District of Columbia has failed to offer any argument to the contrary. Accordingly, since the Food Service Program falls within "operations and transactions" of the Plaintiff, all activities involving the Program are exempt from taxes of any kind, regardless of whether Plaintiff operated the program itself or through an independent contractor.

Defendant argues that *Carson* is distinguishable from the facts of this case. In particular, Defendant maintains that the Supreme Court in *Carson* based its holding on the Commission's specific statutory authority to use independent contractors, whereas the Articles of Agreement contain no such Congressional authorization. Rather, Defendant observes, Section 286h is silent on the issue of using independent contractors.

Defendant's argument is not convincing. While the Court in *Carson* gave weight to the Atomic Energy Act's specific reference to independent contractors, their tax immunity status was not conditioned upon the Act's explicit language. Rather, the Court in *Carson* treated the statutory language as support for its general observation that Congress intended the word "activities" to be all inclusive. 342 U.S. at 235. The Supreme Court stated that "Congress uses the word 'activities' in various sections of the Act, and seems each time to give it a broad sweep." *Id.* It reasoned further that "[i]n none of the sections do we find any suggestion that 'activities' is used in a narrow sense to describe less than all of the functions of the Commission." *Id.* at 236.

In this case as well, the "broad sweep" of the "operations and transactions" language in Section 286h should be recognized. There is nothing to suggest that the "operations and transactions" language "is used in a narrow sense to describe less than all of the functions" of the World Bank. Consequently, the silence of Section 286h regarding independent contractors should be interpreted liberally to effectuate the underlying purpose of the Articles of Agreement and the intent of the signing parties, consistent with customary international law. *Id.; See Stuart*, 489 U.S. at 368; *Mendaro*, 717 F.2d at 616–18.

## IV. Defendant Cannot Retroactively Tax The Plaintiff's Independent Contractor.

### A. In interpreting the language of a treaty the views of the United States take precedence over the views of the District of Columbia.

 Executed treaties to which the United States is a party must be treated as

the supreme law of the land. U.S. Const. art. VI, cl. 2; *see also Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 116 S.Ct. 629, 634, 133 L.Ed.2d 596 (1996) (citing U.S. Const. art. VI, cl. 2). In interpreting any treaty provision, a reviewing court must give effect to the provision's plain meaning. *See, e.g., Sumitomo Shoji America v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982); *see also Air Canada v. United States Dep't of Transp.,* 843 F.2d 1483, 1486 (D.C.Cir.1988) (citing *Maximov v. United States,* 373 U.S. 49, 54, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963)). Where parties to a treaty agree to a provision's meaning, and where such interpretation follows from the provision's clear language, the reviewing court must defer to such interpretation absent strong contrary evidence. *Id.* at 186.

■ Where, however, a treaty's language is unclear, post-ratification practices by the parties may be considered as evidence of the parties' intent. *See Korean Air Lines,* 116 S.Ct. at 634; *see also O'Connor v. United States,* 479 U.S. 27, 33, 107 S.Ct. 347, 93 L.Ed.2d 206 (1986) ("The course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning.").

■ Furthermore, courts must give great weight to the executive branch's interpretation of international agreements. *See Sumitomo Shoji America,* 457 U.S. at 184–85 (citing *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961)); *Mendaro,* 717 F.2d at 620. The courts have held that deference to the views of the Executive Branch is equally important where the interpretation of tax-related provisions are at issue. *See, e.g., McCain v. Commissioner,* 81 T.C. 918, 929, 1983 WL 14900 (1983) (interpreting the tax provision of the Panama Canal Treaty). It is of course the United States government, not the government of the District of Columbia, which is responsible for ensuring that relations with other countries and international organizations, including the World Bank, run smoothly and in accordance with applicable treaties. In resolving a conflict on the proper interpretation of treaty language giving tax immunity to the World Bank, the views of the United States clearly take precedence over the views of the local District of Columbia government.

In this case, Defendant presents no evidence to suggest that the parties intended to grant Plaintiff any less than the broadest possible immunity from taxation. To the contrary, the United States has specifically represented to the Court in this case that international organizations are generally granted tax immunity with the intent to permit the broadest possible freedom from state interference. (*See* Statement of Interest of the United States at 12.) Moreover, the United States adds that treaty provisions granting tax immunity to international organizations must be construed in a liberal and expansive manner, notwithstanding any local law dictating otherwise. (*Id.* at 12–13.) The United States has also informed the parties, prior to the litigation, that the retroactive tax assessment imposed by the District on the operator of the Food Service Program of the World Bank, and paid by the Bank, is inconsistent with the tax immunity conferred by the treaty. *Id.* at 2.

**B. Defendant cannot ignore its consistent practice for more than thirty years of not taxing independent contractors of international organizations.**

■ The District has by its inaction over the last thirty years led the Bank to reasonably believe that its tax immunity would preclude the imposition of tax liability on third party operators of the Bank cafeteria. Defendant argues that it has "always" been its policy to tax independent contractors selling food on the premises of international organizations. (Def.'s Reply at 5.) The facts do not support this statement.

Defendant offers two instances to demonstrate its purported policy. First, in 1991, the District of Columbia advised a *different* independent contractor that the local sales tax would apply to cafeteria sales to employees of the International Monetary Fund ("IMF") when the contractor recorded the sales. (Pl.'s Ex. P.) In this ruling, however, the District stated that the sales tax would not apply so long as the IMF recorded the sales and the contractor received a manage-

ment fee for running the cafeteria. (*Id.*) Defendant, however, fails to provide any evidence that either the World Bank or Gardner Merchant was aware of the existence of this ruling.

Second, Defendant relies on three letters between Marriott Corporation and the District (dated May 13, 1991, June 3, 1991, and January 14, 1993) to prove its contention that the independent contractor was liable for the local sales tax from food services purchased at the World Bank and that the Bank had notice of the District's change in position. (Submission of Def., dated Dec. 3, 1997, Exs. B & C.) Once again, Defendant does not submit any documentation to show that the Bank received copies of the letters or was ever aware that they existed. Moreover, Plaintiff asserts that it did not receive copies of Marriott's letters until just prior to the District's December 3, 1997 submission to the Court.

Significantly, none of the other international organizations in the District of Columbia who also have maintained on-site dining facilities for many years, have ever been assessed a District of Columbia sales and use tax. (Amici Brief in Support of Pl.'s Mot. For Summ. J. at 8.) Thus, Defendant can cite to only two instances in thirty years where it claims to have informed an international organization that it would collect sales and use taxes for cafeteria sales recorded by a contractor. Two discreet instances does not make a policy of thirty years.

Furthermore, contrary to Defendant's contention of having a policy for thirty years, prior rulings issued by Defendant prove otherwise. First, in a ruling issued in 1964 to the World Bank and the IMF, the District of Columbia Alcoholic Beverage Control Board affirmed that the Bank was immune from the provisions of the Alcoholic Beverage Control Act and that the "fact that private dining facilities of your organizations are serviced by catering firms [] does not affect the exemption." (Pl.'s Ex. R.) Second, in 1977, the District of Columbia Licenses and Permits Division reached a similar conclusion when it ruled, with regard to the application of a regulation governing private dining facilities, that "the immunities granted international

organizations [], would not permit us to enforce the regulations." (Pl.'s Ex. S.) Third, in 1993, the District informed an operator of dining facilities that "it would not seek to collect sales taxes retroactively for food sales made by the [contractor] at dining facilities owned by international organizations[.]" (Pl.'s Ex. O.)

In short, relying on interpretation and application of the treaty over the last thirty years by the United States government and the District of Columbia, the Bank could reasonably conclude that its tax immunity extended to the Food Service Program. Given the conclusive evidence that Defendant has not taxed independent contractors of international organizations in more than thirty years, the Court agrees with the Department of State and the Department of Treasury "that the proposed retroactive assessment against Gardner Merchant for Wold Bank cafeteria operations for tax years 1994 and 1995 is inequitable and inconsistent with Article VII, Section 9, of the World Bank's Articles of Agreement." (Statement ¶ 15, Ex. N.)

## V. CONCLUSION

For the reasons discussed above, Plaintiff's Motion for Summary Judgment is **granted** and Defendant's Cross Motion for Summary Judgment is **denied.** An Order will issue with this Opinion.