**INTERNATIONAL BANK FOR RE-
CONSTRUCTION AND DEVEL-
OPMENT, Appellee**

v.

**DISTRICT OF COLUMBIA, Appellant**

No. 98–7055.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 7, 1999.

Decided April 2, 1999.

Donna M. Murasky, Assistant Corpora-
tion Counsel, argued the cause for appel-
lant. With her on the briefs were John M.
Ferren, Corporation Counsel, Charles L.
Reischel, Deputy Corporation Counsel,
and Lutz Alexander Prager, Assistant
Deputy Corporation Counsel.

Albert G. Lauber, Jr. argued the cause
for appellee. With him on the brief was
Lloyd H. Mayer.

Lester Nurick, F. David Lake, Jr., and
Erik H. Corwin were on the brief for amici
curiae The Inter–American Development
Bank, et al.

Before: SILBERMAN, SENTELLE,
and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit
Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The property, income, operations and
transactions of the International Bank for
Reconstruction and Development, com-
monly known as the World Bank, are im-
mune from federal, state and local taxa-
tion. The question in this appeal is
whether a private contractor, retained by
the Bank to provide food services to indi-
viduals on the Bank's premises, has deriv-
ative immunity from District of Columbia
taxes on the contractor's sales of food and
beverages.

I

The World Bank is an international, in-
ter-governmental organization, with head-
quarters in Washington, D.C. Created by
Articles of Agreement drawn up at a con-
ference held in Bretton Woods, New
Hampshire in 1944, the Bank is corporate
in form, with all of its capital stock owned
by its member governments. *See Herbert*

*Harvey, Inc. v. NLRB*, 424 F.2d 770, 773 n. 20 (D.C.Cir.1969). The United States accepted the Articles in the Bretton Woods Agreements Act of 1945, 22 U.S.C. §§ 286–286m. The Bank is empowered to provide financial assistance for the development of member countries, to promote private foreign investment, to stimulate the balanced growth of international trade, and "[t]o conduct its operations with due regard to the effect of international investment on business conditions in the territories of members." Articles of Agreement (as amended Feb. 16, 1989), Art. I. One of the treaty's provisions (Article VII, § 9(a)), which has "full force and effect" throughout the United States, *see* 22 U.S.C. § 286h, confers tax immunity on the Bank in the following terms:

> The Bank, its assets, property, income and its operations and transactions authorized by this Agreement, shall be immune from all taxation and from all customs duties. The Bank shall also be immune from liability for the collection or payment of any tax or duty.

Nearly forty years ago the Bank began providing food services for its employees and guests in its D.C. headquarters. Since 1970 it has engaged an outside contractor for this purpose. Initially, the contractor received a fixed percentage of food-service revenues and the Bank provided a substantial subsidy—which by the mid–1980s amounted to $1.3 million per year. In 1989, the Bank phased out the subsidy, renegotiated the agreement with its contractor—then the Marriott Corporation—and replaced the old management-fee contract with a "modified profit and loss" contract. Under the new arrangement, the contractor continued to receive a percentage of revenues and the Bank continued to provide equipment, space, and utilities, but the burden of any financial loss now fell on the contractor.

The District of Columbia imposes a tax on the retail sale of food and beverages. The vendor is responsible for paying the tax to the District, but "reimbursement for the tax imposed upon the vendor shall be collected by the vendor" from the purchasers of the food and drink. D.C.Code §§ 47–2002(3)(A), 47–2003(a). (The District's compensating-use tax on retail sales of food and beverages is inapplicable when the sales tax is "properly collected." § 47–2202(3)(A).) Until the 1990s, the District had not sought to collect sales or use taxes on food-service transactions at the Bank. Matters changed when, in 1991—shortly after the Bank's contract renegotiation—Marriott twice requested letter rulings from the District's Department of Finance and Revenue regarding the tax status of its food-service operations at the Bank and at the International Monetary Fund. The District responded that cafeteria and vending sales by outside contractors on the premises of international organizations were subject to local sales taxes when the sales were made to employees of the organizations rather than to the organizations themselves.

Marriott's contract lapsed in 1992 and the Bank entered into a new arrangement with Gardner Merchant Food Services, Inc. This contract slightly modified the profit-and-loss arrangement the Bank had with Marriott: Gardner Merchant was to "be allowed profits not to exceed 2% of revenue"; anything in excess of 2% went to the Bank[1]; Gardner Merchant was entitled to general and administrative costs not to exceed 3% of revenue, but it was to be responsible for "pay[ing] out all expenses" and it assumed the risk of "any resultant losses." The contract set forth Gardner Merchant's independent status: "Contractor will, in all its dealings, make it clear that it is an independent contractor to the Bank, and the Contractor and its employees are neither agents, representatives, nor employees of the Bank." Gardner Merchant was to maintain its own

---

1. The record does not disclose whether the Bank actually received any profits for the years covered by the Gardner Merchant contract.

records and hold the Bank harmless for any losses arising out of its services.

A provision in the contract purported to extend to Gardner Merchant the Bank's immunity from the collection and payment of taxes:

> The Bank is exempt from payment of sales, use and excise taxes and shall provide Contractor with tax exemption certification as may be required from time to time. The Bank, and the Contractor acting on the Bank's behalf, are also exempt from collecting such taxes from staff and other user's [sic] of the Bank's food services.

Relying on this provision, Gardner Merchant neither collected nor paid any District of Columbia sales or use taxes in performing its food-service contract.

In March 1996, the District's Department of Finance and Revenue conducted a general audit of Gardner Merchant's records and discovered a tax deficiency. For the tax years 1994 and 1995, the District sought to recover from Gardner Merchant back taxes of $351,396.73, penalties of $158,128.55 and interest of $179,212.33, for a total of $688,737.61. On May 22, 1997, the Bank paid to the District approximately $680,000.00 to satisfy Gardner Merchant's deficiency and, on the same day, filed suit to recover that amount from the District.[2] On cross-motions for summary judgment, the district court ruled in the Bank's favor.

The district court held that Gardner Merchant's operation of the food-service program fell within the scope of the "operations and transactions" for which the Bank enjoys tax immunity. *See International Bank for Reconstruction & Dev. v. District of Columbia*, 996 F.Supp. 31, 35 (D.D.C.1998). The Bank's president is empowered to conduct "the ordinary business of the Bank." *Id.* at 34 (citing Article V, § 5(b) of the Bank's Articles of Agreement). Although the Articles do not ex-

pressly state that providing on-site food services is part of the Bank's "ordinary business," the district court thought it must be: because the Bank's president has responsibility over the "organization, appointment ·and dismissal of the [Bank's] officers and staff," Article V, § 5(b), "[i]t would make no sense to give the President responsibility for the 'organization ... of the officers and staff,' but deny him the authority to provide for the daily food needs of that staff." 996 F.Supp. at 35.

The court observed that the food program would enjoy tax immunity if the Bank itself had operated it. *Id.* The District, while not disputing this, takes issue with the conclusion the court then drew: if the District imposed a tax on the Bank's food program simply because the Bank chose to engage an outside contractor rather than run the program itself, this would constitute an impermissible intrusion into the Bank's decision-making processes. *Id.* In the court's view, such interference would contravene the statutory independence of the World Bank and other international organizations, *see* Articles of Agreement, Article V, § 5(c); 22 U.S.C. § 288; an independence this court recognized in *Atkinson v. Inter–American Dev. Bank*, 156 F.3d 1335, 1337 (D.C.Cir.1998), holding that an international organization was not subject to a garnishment proceeding. *See also Mendaro v. World Bank*, 717 F.2d 610, 615 (D.C.Cir.1983); *Broadbent v. OAS*, 628 F.2d 27, 34 (D.C.Cir. 1980).

The district court seemed to believe, perhaps as an alternative ground of decision, that it would be inequitable for D.C. to collect taxes from Gardner Merchant retroactively for the years 1994 and 1995. *See International Bank*, 996 F.Supp. at 38–39. According to the court, "[t]he District has by its inaction over the last thirty years led the Bank to reasonably believe that its tax immunity would preclude the imposition of tax liability on third party

---

**2.** The District makes nothing of the point that although the Bank paid the taxes and is suing

to recoup its payment, the Bank itself incurred no liability under District law.

operators of the Bank cafeteria." *Id.* at 38. In the court's view, the District produced no credible evidence that either Gardner Merchant or the Bank itself had been on notice of the District's intention to impose such taxes for the years 1994 and 1995.

## II

Like the Constitution and federal statutes, treaties made under the authority of the United States are the "supreme Law of the Land." U.S. Const. art. VI. Whether the World Bank's tax immunity extends to Gardner Merchant's retail sales operations therefore depends on the terms of the treaty—on the terms, that is, of the Articles of Agreement.

As to Article VII, § 9(a), quoted earlier, we can put to one side the Bank's tax immunity regarding its "assets, property and income." The District is not seeking to impose taxes on those items. We also can disregard the Bank's immunity from liability "for the collection or payment of any tax or duty." The liability for the collection and payment of the District's taxes, to the extent any exists, is Gardner Merchant's alone. Thus, if Gardner Merchant shares the Bank's tax immunity, this can only be on the basis that the District has imposed its sales and use taxes on the Bank's "operations and transactions authorized by" the Agreement.

■ The District and the Bank quarrel about whether a cafeteria in the Bank's D.C. office building constitutes an "operation" of the Bank. For its part, the District points to Article IV entitled "Operations." This provision lays out in considerable detail the Bank's authority to make loans and borrow funds, to set terms and conditions on its loans, to relax the schedule of payments, to guarantee loans, to set aside a special reserve and so forth. Nothing in Article IV appears to contemplate treating a cafeteria as an "operation." On the other hand, the Bank and the district court stress the authority given the Bank's president to "conduct, under the direction of the Executive Directors, the ordinary business of the Bank." Art. V, § 5(b). The Bank's president decided to provide in-house food and beverage service at the Bank's headquarters. Food service therefore must be considered part of the Bank's "ordinary business." If "ordinary business" constitutes an "operation" for which the Bank is immune from taxation, then the District cannot impose its taxes.

We think framing the dispute this way misses an essential question. The treaty provides that the "*Bank,* ... and *its* operations and transactions authorized by this Agreement, shall be immune from all taxation and from all customs duties. The *Bank* shall also be immune from liability for the collection or payment of any tax or duty." Art. VII, § 9(a) (emphasis added). We may assume that having a cafeteria on its premises is within the Bank's authority under the Articles. We may also assume that the Bank, through its officers, may decide to provide this service in any way it sees fit. But the question remains—is the provision of food services an "operation" of the *Bank*? The answer depends not so much on how essential the Bank believes the activity to be, but on the arrangements the Bank has made to carry it out. Take for instance janitorial services. The Bank needs to have its offices cleaned and maintained. Every business does. Suppose the Bank hires an outside contractor to perform these services. Although the Bank itself is immune from the National Labor Relations Act, its cleaning contractor may not be, and we so held in *Herbert Harvey, Inc. v. NLRB,* 424 F.2d at 779. To take an example closer to home, the operations of the federal courts cannot be taxed by a state. But if an outside contractor runs a cafeteria in the courthouse, state sales taxes may be imposed, and are.

Here, the district court found, and the Bank concedes, that Gardner Merchant is "a separate and independent entity." *International Bank,* 996 F.Supp. at 34. It is

responsible in every respect for food preparation and sales, and it bears any losses that arise from those sales.[3]  It hires its own employees and maintains its own records.  It has its own commercial objectives, including making a profit from its contract with the Bank.  If the sales tax applied, the Bank would neither collect nor incur liability for paying any District of Columbia tax when a Bank employee or guest purchased food from Gardner Merchant.  The Bank stands wholly outside these transactions.  The legal incidence of the tax would not fall on the Bank.  Gardner Merchant would be responsible for remitting the tax to the District and Gardner Merchant would collect the sales tax from its customers. Whether the customers would entirely bear the corresponding reduction in wealth is a question of economics, depending on another law—that of supply and demand.  *See* ARMEN A. ALCHIAN & WILLIAM R. ALLEN, EXCHANGE & PRODUCTION: COMPETITION, COORDINATION & CONTROL 67–68 (3d ed.1983).

■ As against this, the Bank stresses the general rule that agreements among nations should be construed more liberally than private agreements.  *See* Brief for Appellee at 24 (citing *Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 535, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991); *United States v. Stuart,* 489 U.S. 353, 368, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989)).  From this it concludes that the tax immunity provision should be understood to include third-party transactions such as those involved here.  We do not think the conclusion follows.  We may not read international treaties so broadly as to create unintended benefits or to reach parties not within the scope of a treaty's language.  *See Maximov v. United States,* 373 U.S. 49, 55–56, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963).  "Operations" and "transactions" may have a broad sweep, but the terms are qualified by the pronoun "its," which refers to the Bank.  The immunity provision cannot be read to include within its scope activities conducted by any other entity.  Transactions conducted by independent contractors are not mentioned in Article VII, § 9, and we have seen no evidence that the Articles of Agreement were meant to shield private entities from tax liability arising from their contracts with the World Bank.  In this regard we view it as significant that the United States, as a signatory to the Articles of Agreement, has not seen fit to support the Bank's claim that Article VII would immunize its private contractors from the District's sales tax.[4]  We view as not significant the statements offered by the Bank—one from an official at the European Bank for Reconstruction and Development and another from an administrative services manager at the Asian Development Bank—attesting that the governments of the United Kingdom and the Philippines do not tax cafeteria sales at those two banks.  The statements contain *no detail, and so we do not know whether,* for instance, the Asian Development Bank uses an outside contractor, whether there is a tax on food purchases in the Philippines, whether the authorities in London

3.  Although the Gardner Merchant contract contains much detail about the nature of the food program and allows the Bank to monitor closely for compliance, these contractual provisions do not affect our view that the contractor is independent of the Bank.

4.  In May 1997, the U.S. State Department informed the District by letter of the government's view that imposing the disputed taxes retroactively would be "inequitable and inconsistent with" Article VII, § 9.  The idea appeared to be that the Bank had been lulled into believing that its contractor had tax immunity and so had agreed to hold Gardner Merchant harmless from tax liability.  The letter concluded that it was "without prejudice to the views of the United States Government with respect to the question of whether the prospective collection of sales tax by a World Bank contractor from Bank staff and guests who do not enjoy personal sales-tax privileges is permissible under the Articles of Agreement."  Although the United States filed an amicus brief in the district court taking the same position, it has not presented its views to this court.

or Manila are refraining on the basis of a legal conclusion regarding the applicable treaties, or whether the treaties are comparable to the Articles of Agreement.[5]

The Bank also invokes *Carson v. Roane–Anderson Co.*, 342 U.S. 232, 72 S.Ct. 257, 96 L.Ed. 257 (1952). The state of Tennessee had collected sales and use taxes from independent contractors performing services for the Atomic Energy Commission at Oak Ridge. The Court allowed the contractors to recover the amounts paid, holding that their contracts entitled them to enjoy the benefits of the Commission's tax immunity under the Atomic Energy Act of 1946.[6] (Congress "overruled" the decision one year later, eliminating the tax immunity. *See United States v. Boyd*, 378 U.S. 39, 40, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964).) The Bank argues that since the services of the independent contractors in *Carson* fell within the statutory term "activities," Gardner Merchant's operation of the food service program falls within the treaty's phrase "operations and transactions."

We do not find *Carson* dispositive. For one thing, *Carson* involved different language: "activities" are not "operations and transactions authorized by [the World Bank's] Agreement." To the Supreme Court, the "meaning of 'activities' as applied either to an individual or to a government agency may be broad enough to include what is done through independent contractors as well as through agents." *Id.* at 236, 72 S.Ct. 257. The case thus turned on whether Congress meant the term to have that broader meaning. On

this score, the Court relied on other provisions of the statute using "activities" in its broader sense and on the fact that Congress expressly authorized the Commission to use private contractors in managing its affairs: "Certainly where the pattern of conduct visualized by the Act is the use of independent contractors or agents from the field of private enterprise, the inference is strong that 'activities' means all authorized methods of performing the governmental function." *Id.* No such "strong" inference is present here. Indeed we see no basis for any inference, strong or weak, that the Bank's operations include the activities of private contractors. Nothing in the Articles of Agreement indicates that the signatories contemplated having the Bank retain independent contractors to perform its lending operations.[7]

As against this, the Bank maintains that because it would be immune from the District's sales tax if it had run the food program itself, the same immunity attaches when it engages an independent contractor to perform the service. *See* Brief for Appellee at 26. Otherwise, the argument continues, local taxes would interfere with the Bank's "internal functions" and affect its decisions about how best to serve its workforce. *Id.* The argument has a familiar ring, and there was a time when it might have carried the day. Chief Justice Marshall said in *McCulloch v. Maryland,* that "the power to tax involves the power to destroy." 17 U.S. (4 Wheat.) 316, 431, 4 L.Ed. 579 (1819). Tak-

---

5. We also place no weight on the statement of the New York Department of Taxation and Finance that if the World Bank had an independent contractor operate a cafeteria for it within the headquarters of the United Nations, food sales would be subject to New York state and local sales tax.

6. Section 9(b) of the Act then provided that "[t]he Commission, and the property, activities, and income of the Commission, are hereby expressly exempted from taxation in any manner or form by any State...." *Carson,* 342 U.S. at 233, 72 S.Ct. 257.

7. The Bank attempts to broaden the reach of *Carson* by arguing that its outcome did not depend upon the Atomic Energy Act's express provision for the use of independent contractors. We disagree with such a reading. The *Carson* Court rested its decision precisely on that ground. As the Court interpreted the Act, Congress anticipated that the Commission would perform its functions through independent contractors. *See id.* at 236, 72 S.Ct. 257.

ing this "seductive *cliché*"[8] to heart, the Supreme Court early in this century began conferring immunity from state taxes on so-called "instrumentalities" of the federal government, that is, on private contractors performing work for the government. This derivative tax immunity rested partly on the notion that if the federal government had undertaken the activity itself, the state could not have taxed it, and partly on the basis that tax immunity for private entities was needed to protect the United States from state interference. Many of the cases handed down in this era are discussed in *James v. Dravo Contracting Co.*, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937), and in Thomas Reed Powell, *The Waning of Intergovernmental Tax Immunities*, 58 Harv.L.Rev. 633 (1945). In upholding a state tax on the gross receipts of a federal contractor, *James v. Dravo Contracting Co.* marked a turning point in the Court's approach: henceforth, application of non-discriminatory state taxes on government instrumentalities, with only a remote influence on governmental functions, would be sustained. 302 U.S. at 150, 58 S.Ct. 208.

The Supreme Court's modern jurisprudence on the tax immunities of government "instrumentalities" is instructive for several reasons. It seems to us doubtful that the Articles of Agreement were intended to confer on the World Bank a wider immunity from state and local taxes than that enjoyed by the federal government.[9] Under the terms of the Bretton Woods agreement, all concerned knew that the World Bank's headquarters would be located in the United States. Article V, § 9, provided that the "principal office of the Bank shall be located in the territory of the member holding the greatest number of shares," and that member was the United States. *See* Articles of Agreement, Schedule A. In the mid–1940's, when Article VII, § 9, was drafted and accepted, those naturally interested in the analogous subject of federal immunity from state taxation would have discovered the line of Supreme Court decisions, such as *James* and *Helvering v. Mountain Producers Corp.*, 303 U.S. 376, 58 S.Ct. 623, 82 L.Ed. 907 (1938), refusing to maintain the tax immunity of private contractors performing work for the United States. They would have known as well that the United States had taken the position that any "attempt to distinguish between the varying types of taxes imposed on private persons, according as they interfere with the sovereign, is to perpetuate a rule which has proved to be unsatisfactory and inconsistent." Brief for the United States as *Amicus Curiae*, at p. 44, in *James v. Dravo Contracting Co.*

With all of this in mind, we return to the Bank's argument that Gardner Merchant should be free of the District's sales tax because the Bank would not have been subject to the tax if it had operated the cafeteria itself. If, instead of the World Bank, the United States had made this argument on behalf of one of its contractors, the Supreme Court would have rejected it—"tax immunity is appropriate in only one circumstance: when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned." *United States v. New Mexico*, 455 U.S. 720, 735, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982); *see also Arizona Dep't of Revenue v. Blaze Constr. Co.*, —— U.S. ——, 119 S.Ct. 957, 143 L.Ed.2d 27 (1999). We can think of no reason—certainly none

---

8. *Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 489, 59 S.Ct. 595, 83 L.Ed. 927 (1939) (Frankfurter, J., concurring).

9. The tax immunity of international organizations is based on a principle analogous to the one upon which Chief Justice Marshall relied in *McCulloch*—to protect against the destructive power of state interference. *See, e.g., Broadbent*, 628 F.2d at 34 ("[I]nternational organizations must be free to perform their functions and ... no member state may take action to hinder the organization.")

stemming from the principles governing the construction of international treaties—why similar logic should not apply to the interpretation of the Bank's Articles of Agreement. The District of Columbia's sales and use taxes are not imposed upon the Bank, but upon Gardner Merchant and its customers. Gardner Merchant is by no stretch an instrumentality of the Bank. Nor is Gardner Merchant "so closely connected to the [Bank] that the two cannot realistically be viewed as separate entities."[10] Although the Bank exercises close control over the terms of the contract and Gardner Merchant's performance under it, that does not transform Gardner Merchant into an instrumentality of the Bank. As we mentioned, Gardner Merchant is pursuing private ends for its own benefit. *See New Mexico,* 455 U.S. at 739–40, 102 S.Ct. 1373; *Boyd,* 378 U.S. at 48, 84 S.Ct. 1518. Imposing the tax on Gardner Merchant will not impermissibly intrude on the Bank's freedom from local government control. On the contrary, imposing the tax will merely require the Bank to take an additional factor into account when it negotiates its food-service contract. *Cf. Boyd,* 378 U.S. at 48, 84 S.Ct. 1518. It will exert "a remote, if any, influence upon the exercise of the functions of [the Bank]." *James v. Dravo Contracting Co.,* 302 U.S. at 150, 58 S.Ct. 208 (internal quotation omitted). On the other hand, to hold that the Bank's tax immunity extends to Gardner Merchant's food-service transactions would create an ever-expanding tax immunity without any limiting principle. Must Gardner Merchant pay sales and use taxes on purchases *it* makes pursuant to its contract with the World Bank? Should the company be free from District income taxes? Should the company's employees? These and many other similar questions continually perplexed the Supreme Court after it ventured onto the slippery slope of derivative tax immunity. *See, e.g., Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 173–75, 187, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989); *South Carolina v.*

*Baker,* 485 U.S. 505, 520, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988). We decline the Bank's invitation to set out on the same precipitous course.

### III

The Bank has an alternative position: even if the District of Columbia has the power to impose the disputed taxes on Gardner Merchant, it would be inequitable under the Articles of Agreement for the District to impose them retroactively. The Bank does not contend that the District is equitably estopped from collecting the taxes because of its prior policy of refraining from collecting them. *See* Brief for Appellee at 36 n.9; *see also Automobile Club v. Commissioner,* 353 U.S. 180, 183, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). Rather, the Bank adopts the position of the United States in the district court that the retroactive imposition of the District sales tax would be inequitable under the terms of the Bank's treaty. The idea is that in relying in good faith on its interpretation of the Articles, and the District's prior practice, the Bank entered into the food-service contract promising tax immunity to its contractor; hence, retroactive taxation constitutes taxation of the Bank itself, in violation of Article VII, § 9. The district court seemed to agree, but it also appeared to base its holding at least in part on principles of equitable estoppel: the court noted that D.C. had refrained from imposing the tax on Bank food-service operators for thirty years, and that the Bank had no notice when the District changed course in the early 1990s. *See* 996 F.Supp. at 38–39.

We neither endorse nor reject the view of the United States, as set forth by the Bank. The district court rendered its decision on summary judgment. It is not clear whether the factual predicate for the Bank's argument exists. Given the procedural posture of the case, the District was

---

**10.** The Bank does not contend that the District's sales and use taxes are discriminatory.

entitled to all justifiable inferences. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The district court observed that the District had cited "only two instances in thirty years where it claims to have informed an international organization that it would collect sales and use taxes for cafeteria sales recorded by a contractor." 996 F.Supp. at 39. Although the District may not have produced any evidence that the Bank was aware of the two letters it sent to Marriott, there is a genuine issue of material fact whether the Bank knew of the District's policy with regard to imposing the tax in such cases. A February 1994 letter to the State Department from an attorney in the Bank's legal department stated that the attorney was aware as early as December 1993 of the District's "new position that the World Bank, and the catering firms that act on its behalf, should begin collecting sales tax from staff who purchase meals in the Bank's employee cafeterias." From this letter, one might reasonably infer that the Bank knew of the District's decision to impose the taxes before 1994. This tends to undercut the Bank's equitable claim. The Bank complains that the letter should not have been included in the record; the District counters that the Bank cited the letter in its brief and therefore should be deemed to have waived any procedural objection to it. This is but one of several issues we must leave to the district court.

\* \* \*

We therefore hold that Gardner Merchant, in performing its food service contract at the World Bank's headquarters, did not share the Bank's immunity from the District's sales and use taxes. The order granting summary judgment is reversed and the case is remanded for further proceedings on the Bank's equitable argument.

*So ordered.*