# United States Tax Court

163 T.C. No. 3

J.E. RYCKMAN,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 750-21L.                    Filed August 1, 2024.

————————

P owes approximately $200,000 in Canadian tax for tax years 1993 and 1994. In 2017 the Canada Revenue Agency sent the Internal Revenue Service (IRS) a mutual collection assistance request (MCAR) under the Canada-U.S. Income Tax Treaty (Treaty). Once the U.S. Competent Authority granted the MCAR, the IRS filed a notice of federal tax lien (NFTL) against P. The IRS notified P of the NFTL filing but stated that she had no right to a collection due process (CDP) hearing under I.R.C. §§ 6320 and 6330. P nonetheless requested a CDP hearing within 30 days of the IRS's notice. When the IRS denied P's request, she petitioned for review of that denial under the color of I.R.C. § 6330(d)(1).

*Held*: We have jurisdiction under I.R.C. § 6330(d)(1) to review a determination only if, in making that determination, the IRS was subject to one or more obligations imposed by I.R.C. § 6320 or § 6330.

*Held, further*, Treaty Article XXVI A requires the United States to collect an accepted Canadian revenue claim as it would a U.S. tax assessment for which the taxpayer's right to a CDP hearing (among other rights) has lapsed or been exhausted. Consequently, P has no additional rights under I.R.C. § 6320 or § 6330 with respect

**Served 08/01/24**

to the IRS's collection of her Canadian tax liability, and those statutes imposed no obligations on the IRS with respect to P's hearing request.

*Held, further*, we lack jurisdiction over P's Petition because the IRS did not issue a determination letter to P that would invoke our jurisdiction under I.R.C. § 6330(d)(1), and it had no obligation to do so.

——————

*David R. Jojola, Derek W. Kaczmarek, Nicholas Michaud*, and *Paul J. Vaporean*, for petitioner.

*Ping Chang* and *Derek S. Pratt*, for respondent.

OPINION

COPELAND, *Judge*: Petitioner, J.E. Ryckman, filed her Petition to contest the determination of the Commissioner of Internal Revenue (Commissioner) to deny her a hearing to challenge the filing of a notice of federal tax lien (NFTL) against her by the Internal Revenue Service (IRS). The NFTL was filed to secure Ms. Ryckman's tax liabilities owed to Canada. The IRS is attempting to collect those liabilities on Canada's behalf pursuant to Article XXVI A (Assistance in Collection) of the Canada-U.S. Income Tax Treaty (Treaty).[1]

The Commissioner has moved to dismiss Ms. Ryckman's Petition for lack of jurisdiction. This case raises a question of first impression for our Court: whether we have jurisdiction to review an IRS denial of a hearing request regarding collection of taxes pursuant to a mutual collection assistance request (MCAR) made by Canada under the Treaty.

————————————

[1] Convention With Respect to Taxes on Income and on Capital, Can.-U.S., Sept. 26, 1980, T.I.A.S. No. 11,087, as Amended by the Protocols signed on June 14, 1983, T.I.A.S. No. 11,087 (Protocol 1), and March 28, 1984, T.I.A.S. No. 11,087 (Protocol 2), *as reprinted in* 1986-2 C.B. 258. It was further amended by Protocols signed on March 17, 1995, T.I.A.S. No. 97-1216 (Protocol 3), July 29, 1997, T.I.A.S. No. 97-1216 (Protocol 4), and September 21, 2007, T.I.A.S. No. 08-1215.2 (Protocol 5). We refer to the Convention and the Protocols collectively as the Treaty.

*Background*

The following background is drawn from the parties' pleadings, Motion papers, and Exhibits. This background is stated solely for the purpose of ruling on the Commissioner's Motion to Dismiss for Lack of Jurisdiction and not as findings of fact. Ms. Ryckman resided in Arizona when she filed her Petition.

According to the Canada Revenue Agency (CRA), Ms. Ryckman owes approximately $200,000 in Canadian tax for tax years 1993 and 1994. Ms. Ryckman resided in the United States in 2017 when the CRA sent the IRS an MCAR in accordance with Treaty Article XXVI A(2) (Ryckman MCAR), representing that the 1993 and 1994 tax liabilities are "finally determined" within the meaning of Treaty Article XXVI A(2), i.e., Canada "has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in [Canada] have lapsed or been exhausted."[2] The U.S. Competent Authority, an office within the IRS, granted the MCAR under Treaty Article XXVI A(3)[3] and forwarded it to an IRS collection office.

On December 7, 2020, IRS Revenue Officer Susan Mitchell (RO Mitchell) mailed the NFTL to the Maricopa County Recorder in Phoenix, Arizona. The NFTL lists Ms. Ryckman's 1993 and 1994 liabilities along with the following explanation:

> THIS AMOUNT IS DUE, OWING, AND UNPAID TO THE GOVERNMENT OF CANADA, AND IS BEING COLLECTED ON BEHALF OF CANADA IN ACCORDANCE WITH ARTICLE XXVIA OF THE USA-CANADA INCOME TAX CONVENTION AND APPLICABLE INTERNAL REVENUE LAWS OF THE UNITED STATES OF AMERICA. PAYMENTS SHOULD BE MADE PAYABLE TO THE RECEIVER GENERAL OF CANADA, NOT THE IRS, BUT SHOULD BE MAILED TO THE ADDRESS CONTAINED HEREIN. THE IRS

---

[2] In later correspondence with the IRS, the CRA represented that Ms. Ryckman's liabilities will remain collectable under Canadian law until June 2026.

[3] Treaty Article XXVI A was added to the Treaty by Article 15 of Protocol 3, which entered into force on November 9, 1995. However, Article 21(3) of Protocol 3 provides that Article XXVI A "shall have effect for revenue claims finally determined by a requesting State after the date that is 10 years before the date on which the Protocol enters into force."

COORDINATOR WILL FORWARD THE PAYMENT TO OTTAWA.

On January 25, 2021, RO Mitchell mailed Ms. Ryckman a letter informing her that the NFTL was filed "and that you have the right to a hearing to discuss collection options." However, RO Mitchell represented that a statutory hearing under section 6320(b)[4] was "NOT available to you as a Canadian taxpayer in the United States." On February 4, 2021, Ms. Ryckman's representative faxed to RO Mitchell Form 12153, Request for a Collection Due Process or Equivalent Hearing, requesting a collection due process (CDP) hearing on the NFTL filing under section 6320(b) and indicating that Ms. Ryckman could not fully pay the balance and would like the IRS to consider an installment agreement.

On February 8, 2021, RO Mitchell mailed Ms. Ryckman a letter titled "Request for Collection Due Process Hearing - Denied" (denial letter). In the denial letter, RO Mitchell stated that the IRS could not grant Ms. Ryckman's request for a CDP hearing for the following reason:

> Because the foreign tax liability is treated as a finally determined U.S. tax liability, your procedural rights to restrain collection under U.S. law through a CDP hearing under Internal Revenue Code Sections 6320 or 6330 are treated as lapsed or exhausted.

However, RO Mitchell indicated that Ms. Ryckman could still "request review under the Collection Appeal Program (CAP) of the IRS Independent Office of Appeals to contest the filing of [the NFTL]."

On February 18, 2021, Ms. Ryckman filed her Petition, asking us to determine that the Commissioner erred in denying her a CDP hearing and to remand her case to the IRS Independent Office of Appeals (IRS Appeals) for a statutory hearing.

---

[4] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, and regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times.

*Discussion*

I.      *Tax Court Jurisdiction Generally*

The Tax Court is a court of limited jurisdiction and may exercise jurisdiction only to the extent expressly authorized by Congress. *See* I.R.C. § 7442; *Hallmark Rsch. Collective v. Commissioner*, 159 T.C. 126, 135 (2022); *Breman v. Commissioner*, 66 T.C. 61, 66 (1976). We are without authority to enlarge upon that statutory grant. *McCrory v. Commissioner*, 156 T.C. 90, 93 (2021). Nevertheless, we always have jurisdiction to determine whether we have jurisdiction over a case. *Cooper v. Commissioner*, 135 T.C. 70, 73 (2010). The party seeking to invoke our jurisdiction must affirmatively show that we have jurisdiction. *See David Dung Le, M.D., Inc. v. Commissioner*, 114 T.C. 268, 270 (2000), *aff'd*, 22 F. App'x 837 (9th Cir. 2001). If we lack jurisdiction to consider an issue, then despite a party's choice of our Court as a forum to settle the dispute, we may not decide the issue. *Naftel v. Commissioner*, 85 T.C. 527, 530 (1985).

II.     *Overview of Sections 6320 and 6330*

Sections 6320 and 6330 (CDP statutes) specify CDP rights for taxpayers against whom the IRS has made an NFTL filing or proposes a levy to collect an assessed tax liability. Sections 6320(a) and 6330(a) require the IRS to notify a taxpayer of an NFTL filing or a proposed levy, respectively, and of the taxpayer's right to request (within 30 days of the notice) a CDP hearing with IRS Appeals. Sections 6320(b)(2) and 6330(b)(2) each specify that the taxpayer "shall be entitled to only one hearing under this section with respect to the taxable period to which the unpaid tax [subject to the lien or levy] relates." Section 6320(c) provides that the provisions of section 6330(c), (d) (other than paragraph (3)(B)), (e), and (g) apply to a hearing conducted under section 6320(b).

Section 6330(c) requires the Appeals officer who conducts the CDP hearing to verify satisfaction of all requirements of law and administrative procedure applicable to the NFTL filing or levy, to generally consider any other issues raised by the taxpayer at the hearing, and to consider whether the NFTL filing or levy balances the need for the efficient collection of taxes with the taxpayer's legitimate concern that collection actions be no more intrusive than necessary.

Section 6330(g) provides that if the IRS determines that any portion of a hearing request is based on a position that the IRS has officially identified as frivolous or otherwise reflects a desire to delay or

impede the administration of federal tax law, *see* I.R.C. § 6702(b)(2)(A), then the IRS "may treat such portion as if it were never submitted and such portion shall not be subject to any further administrative or judicial review."

Section 6330(e)(1) provides generally that once a taxpayer timely requests a CDP hearing, then while the hearing and any appeals are pending the IRS may not proceed with any proposed levy action (if applicable) and the period of limitations under section 6502 for collecting the tax is suspended.

Section 6330(d)(1) provides that the taxpayer who requests a CDP hearing "may, within 30 days of a determination under this section, petition the Tax Court for review of such determination (and the Tax Court shall have jurisdiction with respect to such matter)."

The legislative history of the CDP statutes indicates Congress's desire that a taxpayer who submits a CDP hearing request after the 30-day deadline of section 6330(a)(3)(B) still should be afforded a hearing. *See* H.R. Rep. No. 105-599, at 266 (1998) (Conf. Rep.), *reprinted in* 1998-3 C.B. 747, 1020 ("The Secretary must provide a hearing equivalent to the pre-levy hearing if later requested by the taxpayer.") The Commissioner has issued regulations providing for an "equivalent hearing" for taxpayers who make untimely requests under either section 6320(b)(1) or section 6330(b)(1). *See* Treas. Reg. § 301.6320-1(i). "The equivalent hearing will be held by Appeals and generally will follow Appeals' procedures for a CDP hearing." *Id.* subpara. (1). However, generally neither collection action nor the period of limitations for collection is suspended while an equivalent hearing is pending. *Id.* subpara. (2), Q&A-I3, I4; *cf.* H.R. Rep. No. 105-599, at 266, *reprinted in* 1998-3 C.B. at 1020 ("[T]he Secretary is not required to suspend the levy process pending the completion of a hearing that is not requested within 30 days of the mailing of the Notice [of Intent to Levy]."). Furthermore, determinations made in equivalent hearings are not subject to judicial review. *See Ramey v. Commissioner*, 156 T.C. 1, 11 (2021).

III.    *Treaty Article XXVI A*

Treaty Article XXVI A provides in relevant part:

1. The Contracting States undertake to lend assistance to each other in the collection of taxes referred to in paragraph 9, together with interest, costs, additions to

such taxes and civil penalties, referred to in this Article as a "revenue claim".

2. An application for assistance in the collection of a revenue claim shall include a certification by the competent authority of the applicant State that, under the laws of that State, the revenue claim has been finally determined. For the purposes of this Article, a revenue claim is finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted.

3. A revenue claim of the applicant State that has been finally determined may be accepted for collection by the competent authority of the requested State and, subject to the provisions of paragraph 7, if accepted shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim finally determined in accordance with the laws applicable to the collection of the requested State's own taxes.

4. Where an application for collection of a revenue claim in respect of a taxpayer is accepted
        (a) By the United States, the revenue claim shall be treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received[.]

        . . . .

5. Nothing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's finally determined revenue claim by the requested State, based on any such rights that may be available under the laws of either Contracting State. If, at any time pending execution of a request for assistance under this Article, the applicant State loses the right under its internal law to collect the revenue claim, the competent authority of the applicant State shall promptly withdraw the request for assistance in collection.

6. Subject to this paragraph, amounts collected by the requested State pursuant to this Article shall be forwarded to the competent authority of the applicant State. Unless the competent authorities of the Contracting States otherwise agree, the ordinary costs incurred in providing collection assistance shall be borne by the requested State and any extraordinary costs so incurred shall be borne by the applicant State.

7. A revenue claim of an applicant State accepted for collection shall not have in the requested State any priority accorded to the revenue claims of the requested State.

. . . .

9. Notwithstanding the provisions of [Treaty] Article II (Taxes Covered), the provisions of this Article shall apply to all categories of taxes collected, and to contributions to social security and employment insurance premiums levied, by or on behalf of the Government of a Contracting State.

10. Nothing in this Article shall be construed as:

. . . .

    (b) Imposing on either Contracting State the obligation to carry out administrative measures of a different nature from those used in the collection of its own taxes or that would be contrary to its public policy . . . .

IV.    *Analysis of Ms. Ryckman's Petition*

Ms. Ryckman argues that we have jurisdiction over her case under sections 6320(c) and 6330(d)(1). Section 6330(d)(1) provides as follows:

> The person may, within 30 days of a determination *under this section*, petition the Tax Court for review of such determination (and the Tax Court shall have jurisdiction with respect to such matter).

(Emphasis added.) Accordingly, section 6330(d)(1) grants us jurisdiction only to review an IRS determination made "under this section."

Therefore, we must decide whether the denial letter constituted a determination *under* section 6330 (and, by cross-reference, section 6320).

### A. *Jurisdiction Under Section 6330(d)(1)*

We have consistently held that our jurisdiction under section 6330(d)(1) is contingent on (1) the issuance of a valid notice of determination and (2) a timely petition for review.[5] *Goza v. Commissioner*, 114 T.C. 176, 182 (2000). We now clarify whether a denial letter refusing a CDP hearing regarding the collection of Canadian taxes under the Treaty can be construed as a determination letter that would give us jurisdiction. In other words, we must decide whether the denial letter was issued "under this section" (i.e., section 6330 or, by cross-reference, section 6320), which in turn means that in making that determination the IRS was subject (or purported itself to be subject) to one or more obligations imposed (whether expressly or implicitly) by section 6320 or 6330. *See Under*, *Merriam-Webster's Collegiate Dictionary* 1287 (10th ed. 1997), ("subject to the authority, control, guidance, or instruction of"). For instance, if a taxpayer timely files a CDP hearing request, then generally the IRS has an express obligation to hold a hearing, *see* I.R.C. §§ 6320(b)(1), 6330(b)(1), and then an implied obligation to make a determination on the basis of the hearing, *see* I.R.C. § 6330(c)(3). Accordingly, both the prehearing determination of whether to grant the taxpayer a hearing and the posthearing determination of whether to uphold the NFTL filing or levy are made "under this section."

Our interpretation of the phrase "under this section" is consistent with our caselaw interpreting the CDP statutes. For instance, if a taxpayer fails to timely file a CDP hearing request, then absent grounds for equitable tolling of the 30-day deadline, *see Organic Cannabis Found., LLC v. Commissioner*, No. 381-22L, 161 T.C., slip op. at 31 (Sept. 27, 2023), the IRS is not obligated by either CDP statute to hold a hearing or make a determination. (If the IRS has any obligation to hold a hearing in this circumstance, it is imposed by Treasury Regulation § 301.6320-1(i).) We have consistently held that "[a] decision letter issued after an equivalent hearing generally is not considered a determination under section 6330 and is therefore insufficient to invoke

---

[5] In *Boechler, P.C. v. Commissioner*, 142 S. Ct. 1493, 1501 (2022), the Supreme Court held that the 30-day petition filing deadline specified in section 6330(d)(1) is nonjurisdictional and subject to equitable tolling.

our jurisdiction." *Ramey*, 156 T.C. at 11; *see also Moorhous v. Commissioner*, 116 T.C. 263, 270 (2001) ("[B]ecause [the taxpayer] . . . failed to file a timely request for an Appeals Office hearing, the Appeals Office was not *obliged* to conduct such a hearing. In this regard, the decision letter issued to [the taxpayer] . . . was not, and did not purport to be, a determination letter pursuant to section 6320 or section 6330." (Emphasis added.)).

There are limited exceptions to the rule stated in *Ramey,* such as when the taxpayer timely requests a CDP hearing but the IRS offers only an equivalent hearing and issues a decision letter rather than a notice of determination. *See Craig v. Commissioner*, 119 T.C. 252, 259 (2002) (holding that we have jurisdiction over the IRS's determination on a timely requested CDP hearing notwithstanding the determination's label). But in such a case the IRS was in fact obligated by section 6320 or 6330 to make a posthearing determination. Conversely, if the taxpayer was not in fact entitled to a CDP hearing but the IRS issues a notice that purports to be a notice of determination under the CDP statutes and contains no indications to the contrary, then we have held that we have jurisdiction to review the notice. *See Shirley v. Commissioner*, T.C. Memo. 2014-10, at *13–14; *Kim v. Commissioner*, T.C. Memo. 2005-96, 89 T.C.M. (CCH) 1123, 1125–26. Our interpretation of the phrase "under this section" is consistent with these holdings because in such cases the IRS *purports* to be making a determination subject to obligations imposed by the CDP statutes.

We have also held that we have jurisdiction over the IRS's determination that some or all portions of a hearing request are frivolous positions or have a delaying motive, such that administrative and judicial review is not available. *See* I.R.C. § 6330(g); *Buczek v. Commissioner*, 143 T.C. 301, 307–09 (2014); *Thornberry v. Commissioner*, 136 T.C. 356, 367 (2011). Such a determination is subject to the obligation implicitly imposed on the IRS by section 6330(g) to not act arbitrarily and capriciously in determining whether some or all portions of a hearing request are frivolous. *See Buczek*, 143 T.C. at 309. Meanwhile, we have held that if we determine that all portions of a hearing request are indeed frivolous, then we lack jurisdiction to review the IRS's determination to proceed with collection against the taxpayer. *Id.* In that situation the IRS's determination to proceed with collection is not subject to any obligations imposed by either CDP statute, since section 6330(g) denies the taxpayer any further rights under those statutes.

B.      *Scope of the CDP Statutes*

What we must decide is whether the IRS was subject to any obligations imposed by the CDP statutes when it denied Ms. Ryckman's CDP hearing request.  To answer this question, we begin with the statutory text.  Pursuant to section 6320(a)(1), the provisions of section 6320 apply only to a "person described in section 6321," viz, a person "liable to pay any tax [who] neglects or refuses to pay the same after demand."  Meanwhile, although section 6330(a)(1) does not specifically cross-reference section 6331 (which generally authorizes the IRS to collect an unpaid "tax" by levy), section 6330(a)(3)(A) provides that the levy notice sent to the taxpayer must include "the amount of unpaid tax." Therefore, we hold that the rights afforded by the CDP statutes apply only to those people subject to IRS actions to collect "tax."

Ms. Ryckman argues that the word "tax" in the CDP statutes is not limited to taxes imposed by the Code but also encompasses foreign taxes being collected by the IRS pursuant to the provisions of an in-force treaty (for instance, the Canadian taxes at issue in this case).  We agree that "if the United States accepts a request from Canada to collect a revenue claim, the United States must collect the revenue claim as if it were its own revenue claim," and that "[Treaty] Article 26A authorizes th[e] IRS to employ the procedures created under I.R.C. §§ 6201, 6301 to pursue and collect Canadian revenue claims."  *Retfalvi v. United States*, 930 F.3d 600, 610–11 (4th Cir. 2019); *see also Lidas, Inc. v. United States*, 238 F.3d 1076, 1081 (9th Cir. 2001) (holding that the IRS is "bound by law to employ the same procedures to obtain information requested by France pursuant to the [France-U.S. Income Tax] Treaty as it would employ in the investigation of a domestic tax liability"). However, we must still consider how the Treaty provisions interact with the CDP statutes.

C.      *Interpretation of Treaty Article XXVI A*

1.      *General Principles*

Income tax treaties to which the United States is a party are on an equal footing with domestic law in that both are "the supreme Law of the Land."  U.S. Const. art. VI, cl. 2; *see also* I.R.C. § 894(a) ("The provisions of this title [i.e., the Code] shall be applied to any taxpayer with due regard to any treaty obligation of the United States which applies to such taxpayer.");  I.R.C. § 7852(d)(1) ("For purposes of determining the relationship between a provision of a treaty and any

law of the United States affecting revenue, neither the treaty nor the law shall have preferential status by reason of its being a treaty or law."). When a treaty and an act of Congress "relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other." *Whitney v. Robertson*, 124 U.S. 190, 194 (1888).[6]

When interpreting a treaty, we begin with the text of the treaty and give the terms their ordinary meaning unless a more restricted sense is clearly intended. *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180 (1982); *Am. Air Liquide, Inc. & Subs. v. Commissioner*, 116 T.C. 23, 29 (2001), *aff'd*, 45 F. App'x 721 (9th Cir. 2002). The plain meaning of a treaty's text controls unless its effect is contrary to the intent or expectations of the treaty partners. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 346 (2006); *Sumitomo Shoji Am., Inc.*, 457 U.S. at 180; *Amaral v. Commissioner*, 90 T.C. 802, 812 (1988). Treaties generally should be liberally construed to give effect to the purpose of the treaty. *United States v. Stuart*, 489 U.S. 353, 368 (1989); *Estate of Silver v. Commissioner*, 120 T.C. 430, 434 (2003). "[W]here a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred . . . ." *Stuart*, 489 U.S. at 368 (quoting *Bacardi Corp. of Am. v. Domenech*, 311 U.S. 150, 163 (1940)). In addition to consulting the ordinary meaning of a treaty's terms, we may consult the interpretation of a treaty provision adopted by the relevant Government agency (here, the IRS). While not dispositive, the agency's interpretation "is entitled to great weight." *Sumitomo Shoji Am., Inc.*, 457 U.S. at 184–85.[7]

---

[6] The dissenting opinion states that the opinion of the Court "presents an irreconcilable conflict with the later-enacted statutory CDP provisions." *See* dissenting op. p. 25. While we agree that the CDP statutes would trump the Treaty in the case of an irreconcilable conflict (because they were enacted later in time), we do not see there to be a conflict. We address the dissent's concerns *infra* notes 10–12.

[7] The dissenting opinion cites a nonprecedential memorandum issued by the IRS Office of Chief Counsel in 1999 as evidence that the IRS has interpreted Treaty Article XXVI A as not foreclosing CDP rights for U.S. taxpayers subject to IRS collection activity for Canadian revenue claims. *See* I.R.S. Chief Couns. Adv. Mem. 199939034, 1999 WL 779472 (Oct. 1, 1999); dissenting op. p. 29. However, the dissent fails to mention that since at least 2005 the *Internal Revenue Manual* (IRM)—another nonprecedential IRS publication—has consistently reflected the position that CDP

Treaty Article III(2) provides:

> As regards the application of the Convention by a Contracting State any term not defined therein shall, unless the context otherwise requires . . . , have the meaning which it has under the law of that State concerning the taxes to which the Convention applies.

### 2. *The Treaty's Foreclosure of CDP Rights*

Under Treaty Article XXVI A(4)(a), once the United States accepts a Canadian revenue claim, it is required to treat that claim "as an assessment under United States laws against the taxpayer." On the basis of this provision's context (viz, a tax treaty article dealing with collection of tax liabilities), we interpret Treaty Article XXVI A(4)(a) to require the United States to treat an accepted Canadian revenue claim as a U.S. *tax* assessment.

However, Treaty Article XXVI A(3) provides the caveat that an accepted revenue claim "shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim finally determined in accordance with the laws applicable to the collection of the requested State's own taxes." The definition of "finally determined" is indicated by Treaty Article XXVI A(2): "[A] revenue claim is finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted." Accordingly, we interpret Treaty

---

rights do *not* attach to MCARs under tax treaties. *See* IRM 5.21.7.4.1(10)(b) (June 3, 2020) ("A taxpayer identified in an inbound MCAR case is not entitled to a Collection Due Process (CDP) hearing because the tax liability at issue is a foreign tax liability. A taxpayer may request review under the Collection Appeals Program (CAP)."); IRM 5.21.7.4.5 (Nov. 13, 2015) ("The taxpayer does not have a CDP right for a foreign tax liability, but is entitled to Collection Appeals Program (CAP) rights."); IRM 5.1.8.7.7.1(6) (June 1, 2010) ("Taxpayers on incoming MCAR cases are not entitled to Collection Due Process (CDP) rights, but are entitled to Collection Appeals Program (CAP) rights."); IRM 5.1.8.7.7.1(6) (Apr. 22, 2008) ("Taxpayers on incoming MCAR cases are not entitled to CDP rights but are entitled to CAP rights."); IRM 5.12.6.3.6.1(3) (2005) ("Collection Due Process rights are not available for MCARs. However, . . . a Collection Appeals Program hearing may be requested by the taxpayer . . . ."). Although neither the IRM nor Chief Counsel Advice has the force of law or confers substantive rights on taxpayers, the IRM "govern[s] the internal affairs and administration of the IRS, and reliably describes the functions delegated to the different offices within the IRS." *DelPonte v. Commissioner*, 158 T.C. 159, 161 n.4 (2022).

Article XXVI A(3) to provide that when the United States accepts a Canadian revenue claim, the claim must be treated as a U.S. tax assessment for which all rights to restrain collection have lapsed or been exhausted.

The Treaty does not define the phrase "restrain collection," but the right to request a CDP hearing under section 6320(b) or 6330(b) is manifestly a right to restrain collection. If IRS Appeals agrees with the taxpayer in a levy hearing, the IRS will not proceed with the levy (or will return previously seized property to the taxpayer). Agreement with the taxpayer in an NFTL hearing might result in release or withdrawal of the NFTL, *see* I.R.C. §§ 6325(a)(1), 6323(j), thereby removing any priority the IRS held over the taxpayer's other secured creditors, *see* I.R.C. § 6323(a). Therefore, when the United States accepts a Canadian revenue claim, it must collect the revenue claim as it would a U.S. tax assessment for which the taxpayer's administrative and judicial rights to restrain collection, *including* rights to a CDP hearing, have lapsed or been exhausted. Sections 6320(b)(2) and 6330(b)(2) generally grant only one opportunity for a CDP hearing (and thus a judicial appeal) with respect to a given tax period and a given collection action. *See* Treas. Reg. §§ 301.6320-1(d)(1) and (2), Q&A-D1, 301.6330-1(d)(1) and (2), Q&A-D1. Therefore, it would be unreasonable to interpret Treaty Article XXVI A as providing an additional administrative or judicial forum in the United States when the opportunity for such appeals in Canada has been exhausted. To hold otherwise would make superfluous the requirement in Treaty Article XXVI A(2) that "all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted." Finally, Treaty Article XXVI A(5) reiterates that "[n]othing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's [i.e., Canada's] finally determined revenue claim by the requested State [i.e., the United States], based on any such rights that may be available under the laws of either Contracting State."

Accordingly, Treaty Article XXVI A forecloses the administrative and judicial protections of the CDP statutes in the case of Canadian revenue claims. Even if the CDP statutes in principle apply to the IRS's collection of foreign taxes, Treaty Article XXVI A(3) requires the United States to treat a Canadian revenue claim as though the taxpayer has exhausted all CDP rights. Therefore, when the IRS granted the Ryckman MCAR and filed an NFTL against Ms. Ryckman, the Treaty precluded her from having what would effectively be an additional CDP hearing because such rights were exhausted or lapsed in Canada.

Ms. Ryckman's situation is analogous to that in which the IRS denies a CDP hearing request for a tax period and collection action for which the taxpayer already had a hearing opportunity. We have held that we lack jurisdiction to review a decision letter issued after an equivalent hearing on a nonstatutory request. *See Orum v. Commissioner*, 123 T.C. 1, 11–12 (2004), *aff'd*, 412 F.3d 819 (7th Cir. 2005). Absent a determination made by the IRS under section 6320 or 6330, Ms. Ryckman lacked the jurisdictional hook to enter this Court.

Furthermore, Treaty Article XXVI A(10)(b) does not alter this result. That subparagraph provides that nothing in Article XXVI A "shall be construed as . . . [i]mposing on either Contracting State the obligation to carry out administrative measures of a different nature from those used in the collection of its own taxes or that would be contrary to its public policy." Of course, the United States generally does not collect U.S. taxes by NFTL filing or levy without first affording the taxpayer a right to a CDP hearing. However, if Treaty Article XXVI A(10)(b) were read to import the full range of legal protections for taxpayers under the Code, then it would directly conflict with Treaty Article XXVI A(3) (which requires the requested State to collect an accepted revenue claim as though all rights to restrain collection in the requested State have lapsed or been exhausted) and also Treaty Article XXVI A(5) (which provides that nothing in Treaty Article XXVI A shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's revenue claim by the requested State). The best way to harmonize these provisions is to interpret Treaty Article XXVI A(10)(b) as clarifying that neither Contracting State has an obligation to carry out administrative measures of a different nature than those used in the collection of its own *finally determined* taxes. *Cf. United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . [e.g.,] because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law . . . ."). In fact, it would be a very unusual step to require the IRS to verify that all requirements of Canadian law and Canadian administrative procedure were followed in making the revenue claim that the Treaty has tasked the IRS with collecting. *Cf.* I.R.C. § 6330(c)(1) ("The appeals officer shall at the hearing obtain verification from the Secretary that the requirements of any applicable law or administrative procedure have been met."). Likewise, it would be untenable for the IRS to grant a collection alternative, such as an

installment payment arrangement or an offer-in-compromise,[8] on behalf of the CRA.[9]  Finally, we note that we are unaware of any public policy reason for ensuring CDP rights with respect to accepted Canadian revenue claims for which the taxpayer's analogous Canadian rights have lapsed or been exhausted.

Ms. Ryckman argues that to the extent Treaty Article XXVI A conflicts with the CDP statutes, the Code sections must prevail since they were enacted later in time.[10]  *See Whitney*, 124 U.S. at 194.

[8] In fact, the acceptance of an offer-in-compromise would reduce the amount of the revenue claim—improperly impeding the CRA from collecting the full amount of Canadian tax due.

[9] We have not been asked (and we decline to address) whether Ms. Ryckman could pursue collection alternatives directly with the CRA.

[10] The CDP statutes were added to the Code by the IRS Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 3401, 112 Stat. 685, 746–50, and would clearly be controlling under the last-in-time rule if the Treaty and the CDP statutes could not be harmonized.  For the reasons set forth in this Opinion, we see no reason to resort to that rule.  Furthermore, the last-in-time rule is analogous to the doctrine of implied repeal, under which courts give precedence to a later-in-time statute that contradicts an earlier one (but first endeavor to interpret the statutes to avoid a conflict).  *See Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 880 (D.C. Cir. 2006) (Kavanaugh, J., concurring) ("The [last-in-time rule] is quite similar to the familiar doctrine against implied repeal of statutes—under which courts will not interpret an ambiguous statute to repeal a prior statute.").  As the Supreme Court reminds us: "'[R]epeals by implication are not favored' and will not be presumed unless the 'intention of the legislature to repeal [is] clear and manifest.'"  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007) (second alteration in original) (quoting *Watt v. Alaska*, 451 U.S. 259, 267 (1981)).  The Supreme Court has clarified this principle as follows: "It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum."  *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976).  What that means here is that the provisions for collection of finally determined Canadian revenue claims set forth by the earlier enacted Treaty should not be subsumed by the more general CDP statutes (which are not by their terms limited to any particular type or types of tax).  Further, the U.S. Court of Appeals for the Ninth Circuit, to which an appeal of this case would lie absent a contrary stipulation by the parties, *see* I.R.C. § 7482(b)(1)(G)(i), has adopted a "minor exception" corollary to the doctrine of implied repeal, under which, "by creating minor exceptions to later-enacted statutes based on earlier ones, both statutes can be preserved," *Ledezma-Galicia v. Holder*, 636 F.3d 1059, 1070 (9th Cir. 2010) (quoting *Lujan-Armendariz v. INS*, 222 F.3d 728, 744 (9th Cir. 2000)); *see also Donaldson v. United States*, 653 F.2d 414, 418 (9th Cir. 1981).  Because we follow a court of appeals decision that is squarely on point if appeal of our decision lies to that court of appeals alone, we take heed of relevant Ninth Circuit precedent here.  *See Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).  The Ninth

However, Treaty Article XXVI A does not conflict with either CDP statute. Rather, while those statutes by default provide taxpayers with certain rights to restrain collection, they also limit administrative and judicial review in certain circumstances. Treaty Article XXVI A, as well, forecloses those default rights in the context of Canadian revenue claims accepted by the IRS.[11] Neither CDP statute provides that its provisions apply notwithstanding any other law. By contrast, in *Whitney*, 124 U.S. at 192–93, a treaty provided that the United States would not impose any higher duties than those specified in the treaty on certain imports from the Dominican Republic, while a later U.S. statute imposed duties "of general application, making no exception in favor of goods of any country." In such a true conflict as that, the Supreme Court held that the later-in-time law must prevail. *Id.* at 194. In this case, by contrast,

---

Circuit has clarified that the presence of a "notwithstanding any other law" clause in the later-enacted statute may defeat the minor exception corollary. *See United States v. Novak*, 476 F.3d 1041, 1052–53 (9th Cir. 2007). However, as noted in the text above, the CDP statutes do not contain a "notwithstanding" clause. Therefore, to the extent that our interpretation of Treaty Article XXVI A is construed as potentially conflicting with the CDP statutes (a construction we reject), the last-in-time rule still does not apply in favor of the CDP statutes. Rather, Treaty Article XXVI A might then be seen as a minor exception to the general CDP statutes (an exception involving only the narrow class of accepted Canadian revenue claims). "At most this leaves a small puncture in a broad shield." *Donaldson*, 653 F.2d at 418.

[11] The CDP statutes provide (among other things) prerequisites for the existence of a taxpayer's CDP rights: The taxpayer must timely request a hearing, I.R.C. §§ 6320(a)(3)(B), 6330(a)(3)(B); Treas. Reg. § 301.6330-1(b)(2), Q&A-B2, and the taxpayer generally is not entitled to more than one CDP hearing opportunity per tax period, I.R.C. §§ 6320(b)(2), 6330(b)(2); Treas. Reg. § 301.6330-1(d)(2), Q&A-D1. (We do note however that the 30-day deadline for the taxpayer to request a CDP hearing after receiving a lien or levy notice, *see* I.R.C. §§ 6320(a)(3)(B), 6330(a)(3)(B), may be equitably tolled where the circumstances warrant it, *Organic Cannabis Found., LLC*, 161 T.C., slip op. at 31.) By contrast, Treaty Article XXVI A(2) and (3) provide (by implication) that those prerequisites are deemed unsatisfied in the case of an accepted Canadian revenue claim. (That is, Treaty Article XXVI A(2) and (3) in effect direct the IRS to treat the taxpayer, for purposes of section 6330, as though she either failed to timely request a CDP hearing or already received one.) Therefore, the CDP statutes and Treaty Article XXVI A(2) and (3) address different subject matters—the prerequisites for CDP rights in the one case, and conditions for deeming those prerequisites unsatisfied in the other—and thus cannot conflict with each other. (For instance, the CDP statutes nowhere say that their prerequisites can never be deemed or treated as unsatisfied. Likewise, Treaty Article XXVI A never provides a different set of prerequisites for CDP rights than those provided in section 6330.) Treaty Article XXVI A(3) instructs the United States to treat an accepted Canadian revenue claim as a finally determined revenue claim under U.S. law concerning collection (of which the CDP statutes are an instance). This instruction does not contradict the CDP statutes because the hearing rights they afford do not apply to finally determined revenue claims in the first place.

it is entirely possible to construe the CDP statutes and Treaty Article XXVI A so as to give effect to both, and we are therefore bound to do so. *Whitney*, 124 U.S. at 194. Moreover, Treaty Article XXVI A does not fairly admit of a construction under which Ms. Ryckman would have additional administrative or judicial rights such as those to a CDP hearing with respect to the NFTL. *Cf. Stuart*, 489 U.S. at 368.[12]

---

[12] The dissenting opinion points to the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Japan-U.S., Nov. 6, 2003, T.I.A.S. No. 04-330, as Amended by the Protocols signed on November 6, 2003, T.I.A.S. No. 04-330, and January 24, 2013, S. Treaty Doc. No. 114-1 (2015) (Japan-U.S. Convention), and the U.S. Treasury Department's Technical Explanation of the 2013 Protocol as evidence for a contrary interpretation of the Treaty. *See* dissenting op. p. 30. Article 27 of the Japan-U.S. Convention institutes a mutual collection assistance regime similar to that under the Treaty, and the Technical Explanation indicates that outstanding CDP rights do not preclude a U.S. revenue claim from being "finally determined." However, the Japan-U.S. Convention cannot be taken as evidence (other than evidence by contrast) of what the United States and Canada agreed to in the Treaty with regard to CDP rights. This is because there are at least four significant differences between the Japan-U.S. Convention and the Treaty that bear on the CDP rights issue:

1. Article 27(5) of the Japan-U.S. Convention defines a revenue claim as "finally determined" *not* when all administrative and judicial rights "to restrain collection" in the applicant State have lapsed or been exhausted (as in Treaty Article XXVI A(2)), but instead when all administrative and judicial rights "to dispute or appeal the revenue claim" have lapsed or been exhausted. The latter definition, unlike the former, does not clearly encompass challenges to "collection" as opposed to the "liability" amount.

2. Paragraph 15(a)(i) of the 2003 Protocol to the Japan-U.S. Convention provides that "[f]or the purposes of evaluating the final determination of a revenue claim [in the context of Article 27(5)] . . . in the case of the United States, any administrative or judicial rights available to the taxpayer in connection with the revenue claim that arise after the collection of the revenue claim . . . shall not be taken into account." The Treaty contains no comparable proviso.

3. Article 27(6) of the Japan-U.S. Convention provides that once a revenue claim has been accepted, it "shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim in accordance with the laws applicable to the collection of the requested State's own revenue claims." This provision is markedly different from Treaty Article XXVI A(3), which requires the requested State to collect an accepted revenue claim as though it were its own revenue claim *finally determined* in accordance with the laws applicable to the collection of the requested State's own taxes." (Emphasis added.) It is telling that the words "finally determined"

D. *The IRS's Determination on Ms. Ryckman's Hearing Request*

Because Ms. Ryckman had no additional administrative or judicial rights in the United States under the CDP statutes with respect to the NFTL, neither statute imposed any obligations on the IRS in its treatment of her hearing request. Therefore, the IRS's denial letter foreclosing Ms. Ryckman's CDP hearing request was not a determination letter subject to judicial review under section 6330(d)(1), and we are without jurisdiction to consider Ms. Ryckman's Petition.

To reflect the foregoing,

*An order of dismissal for lack of jurisdiction will be entered.*

Reviewed by the Court.

KERRIGAN, FOLEY, NEGA, JONES, GREAVES, and MARSHALL, *JJ.*, agree with this opinion of the Court.

BUCH, PUGH, ASHFORD, URDA, TORO, and WEILER, *JJ.*, dissent.

---

were removed from the collection procedures in the Japan-U.S. Convention.

4. Article 27(7) of the Japan-U.S. Convention provides, in relevant part, that "acts of collection carried out by the requested State in pursuance of an application for assistance, which, according to the laws of the applicant State, would have the effect of suspending or interrupting the period of limitation on the collection of a revenue claim in the applicant State if carried out by the applicant State, shall also have this effect with respect to the revenue claim under the laws of the applicant State." There is no comparable provision in the Treaty, which means that if Ms. Ryckman were given a CDP hearing, the relevant Canadian periods of limitation on collection would continue to run for the duration of that hearing and any subsequent judicial action. (Canada's Income Tax Act, R.S.C. 1985, c. 1, §§ 222(8)(a) and 225.1, pauses the Canadian period of limitation on collection if the taxpayer appeals the tax assessment in a Canadian court, but no mention is made of appeals to any foreign collection authority or foreign court.) This scenario may well demonstrate at least one reason why Treaty Article XXVI A(5) clarifies that the Treaty does not provide for any further administrative or judicial review of Canada's finally determined revenue claims by the United States.

JONES, *J.*, concurring: I join the opinion of the Court in full. I write separately to underscore why the Constitution requires steadfast adherence to the text of the Canada-U.S. Income Tax Treaty,[1] which is an agreement that was negotiated and duly enacted pursuant to the authority vested in the political branches under our constitutional scheme. The Court's role in interpreting treaties is to faithfully interpret the text of the agreement, and the opinion of the Court is consistent with that mandate.

The Treaty Clause of the Constitution provides that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." U.S. Const. art. II, § 2, cl. 2. The Canada-U.S. Income Tax Treaty is one such treaty, duly enacted by the authority vested in the President, by and with the advice and consent of the Senate. "The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín v. Texas*, 552 U.S. 491, 506 (2008). Further, as the opinion of the Court explains, we give the terms of the Treaty their ordinary meaning unless a more restricted interpretation is clearly intended. *See, e.g.*, *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180 (1982); *Bhutta v. Commissioner*, 145 T.C. 351, 360 (2015); *see also* op. Ct. p. 12. "The clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" *Sumitomo Shoji Am., Inc.*, 457 U.S. at 180 (quoting *Maximov v. United States*, 373 U.S. 49, 54 (1963)); *see also Bhutta*, 145 T.C. at 360; op. Ct. p. 12.

Treaties generally should be liberally construed to give effect to their purpose. *See, e.g.*, *United States v. Stuart*, 489 U.S. 353, 368 (1989). However, courts "may not read international treaties so broadly as to create unintended benefits or to reach parties not within the scope of a treaty's language." *Int'l Bank for Reconstr. & Dev. v. Dist. of Columbia*, 171 F.3d 687, 691 (D.C. Cir. 1999) (citing *Maximov*, 373 U.S. at 55–56);

---

[1] Convention With Respect to Taxes on Income and on Capital, Can.-U.S., Sept. 26, 1980, T.I.A.S. No. 11,087, as Amended by the Protocols signed on June 14, 1983, T.I.A.S. No. 11,087 (Protocol 1), and March 28, 1984, T.I.A.S. No. 11,087 (Protocol 2), *as reprinted in* 1986-2 C.B. 258. It was further amended by Protocols signed on March 17, 1995, T.I.A.S. No. 97-1216 (Protocol 3), July 29, 1997, T.I.A.S. No. 97-1216 (Protocol 4), and September 21, 2007, T.I.A.S. No. 08-1215.2 (Protocol 5). The opinion of the Court refers to the Convention and the Protocols collectively as the Treaty. *See* op. Ct. note 1.

*see also Baturin v. Commissioner*, 31 F.4th 170, 176 (4th Cir. 2022), *rev'g and remanding* 153 T.C. 231 (2019).

The United States ratified the Treaty with the expectation that it would be interpreted according to its terms. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 346 (2006) (citing 1 Restatement (Third) of Foreign Relations Law of the United States § 352(1) (Am. L. Inst. 1986)). By agreeing to assist Canada under these terms, the United States is bound in a matter of grace and comity. *See Opati v. Republic of Sudan*, 590 U.S. 418, 421 (2020). Further, the Treaty embodies those judgments that the Constitution reserves to the political branches. *See* U.S. Const. art. II, § 2, cl. 2. Therefore, faithful adherence to and interpretation of the text of the Treaty is critical so as not to upset these complex and delicate foreign policy judgments. *See Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1067 (D.C. Cir. 2024).

The opinion of the Court closely adheres to the text of the Treaty. Specifically, the opinion of the Court carefully and persuasively considers the phrases "finally determined" and "restrain collection" in Article XXVI A(2). *See* op. Ct. pp. 13–15.[2] Further, the opinion of the Court hews to the plain text of the Treaty, which prohibits the provision of any rights of administrative or judicial review of a Canadian revenue claim by the United States. Specifically, Article XXVI A(5) of the Treaty provides that "[n]othing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's finally determined revenue claim by the requested state, based on any such rights that may be available under the laws of either Contracting State." *See* op. Ct. pp. 13–15. Accordingly, the Court properly concludes that an accepted Canadian revenue claim must be treated as a U.S. tax assessment for which all rights to restrain collection have been exhausted. *See* op. Ct. p. 13.

---

[2] Although the definition in Article XXVI A(2) is formulated solely in terms of the applicant State (Canada here), *see* dissenting op. pp. 27–28, it seems rather unlikely that the Treaty partners intended the phrase "finally determined" as used in Article XXVI A(3) (in regard to the requested State (the United States here)) to be defined without reference to the definition just given in Article XXVI A(2).

And it is noteworthy that Article XXVI A(3) refers to the laws applicable to *collection*, not simply *assessment*. CDP rights are part of the collection process. So it would be odd to determine that a U.S. tax liability is "finally determined in accordance with the laws applicable to . . . collection" when the taxpayer's rights to a CDP hearing have not yet lapsed or been exhausted.

The dissent misses the forest for the trees in its effort to create friction between the Code and the Court's interpretation of the Treaty. *See* dissenting op. pp. 24–25. In doing so, it forsakes the crucial perspective that this case arises under a treaty, duly negotiated and approved by the political branches. The Court's interpretation is respectful of our role in the constitutional scheme and faithful to the text of the agreement between the sovereigns. The dissent's reading would impermissibly expand the scope of the Treaty and create benefits unsupported by its plain text. *See, e.g., Int'l Bank for Reconstr. & Dev.*, 171 F.3d at 691 (citing *Maximov*, 373 U.S. at 55–56); *see also* op. Ct. pp. 13–14. The opinion of the Court correctly avoids opening the door to a legal process that the text of the Treaty does not support and that the political branches have not clearly authorized.

FOLEY, NEGA, and COPELAND, *JJ.*, agree with this concurring opinion.

URDA, *J.*, dissenting: The opinion of the Court posits that the United States relinquished by treaty in 1995 procedural safeguards that Congress did not enact until 1998. The opinion of the Court's reading of the Treaty—at once too broad and too narrow—generates an irreconcilable conflict between the Treaty and the CDP procedures subsequently enshrined in the Code. The later enactment must control. The attempt of the opinion of the Court to harmonize the two is little more than wishing away the problem that it birthed. Nonetheless, harmony *is* possible in this case, as the applicable Treaty provisions, properly read together, are fully consistent with the procedural protections governing collection that Congress saw fit to enact. Under that harmonious reading of the Treaty and the CDP procedures, Ms. Ryckman prevails.

I.

A survey of the conflict between the Treaty and the Code that the opinion of the Court has created must be grounded in the legal principles governing this area. "Where the Code and a treaty pertain to the same subject matter but manifest an irreconcilable conflict, 'the last expression of the sovereign will * * * control.'" *Adams Challenge (UK) Ltd. v. Commissioner*, 156 T.C. 16, 44 (2021) (quoting *Chae Chan Ping v. United States*, 130 U.S. 581, 600 (1889)). "A conflict is found only where there is 'a clear repugnancy' between the statute and the treaty." *Id.* at 45 (quoting *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 457 (1945)). On the other hand, "if there is no conflict between the two, then the Code and the treaty should be read harmoniously, to give effect to each." *Id.* at 44 (quoting *Pekar v. Commissioner*, 113 T.C. 158, 161 (1999)).

The Supreme Court has "held 'that an Act of Congress . . . is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null.'" *Breard v. Greene*, 523 U.S. 371, 376 (1998) (quoting *Reid v. Covert*, 354 U.S. 1, 18 (1957) (plurality opinion)).[1] To put it another way, "it is within Congress' power to change domestic law, even if the law originally arose from a self-executing treaty." *Noriega v. Pastrana*, 564 F.3d 1290, 1295–96 (11th Cir. 2009). "Whether or not the United States 'undertakes' to comply with a treaty says nothing about

---

[1] The opinion of the Court attempts to avoid controlling treaty interpretation principles by importing the doctrine of implied repeal, which the Court thinks provides firmer footing. *See* op. Ct. note 10. The doctrine of implied repeal has no applicability to this treaty interpretation question.

what laws it may enact. The United States is *always* 'at liberty to make . . . such laws as [it] think[s] proper.'" *Medellín v. Texas*, 552 U.S. 491, 509 n.5 (2008) (quoting *Todok v. Union State Bank of Harvard, Neb.*, 281 U.S. 449, 453 (1930)).

The treaty interpretation put forward by the opinion of the Court produces an irreconcilable conflict with procedural protections later enacted in sections 6320 and 6330. The opinion of the Court reads Article XXVI A to foreclose access to any procedural safeguards with respect to the issuance of an NFTL to collect a liability under the Treaty. Just three years after the Treaty's ratification, however, Congress saw fit to condition the IRS's use of liens and levies to collect a liability on access to procedural safeguards including a CDP hearing and judicial review. As there is a clear repugnancy between the Court's interpretation of the Treaty (no rights tied to an NFTL filing) and the statutory provisions (yes, rights), the later enactment must control. *See, e.g.*, *Medellín*, 552 U.S. at 509 n.5; *Breard*, 523 U.S. at 376; *see also Adams Challenge*, 156 T.C. at 44.

The opinion of the Court makes a half-hearted attempt to harmonize the two authorities, but the clash remains. The opinion of the Court hangs its hat on the fact that "[n]either CDP statute provides that its provisions apply notwithstanding any other law." *See* op. Ct. p. 17. This view is askew. The CDP statutes did not need any additional text to make clear that they trump prior conflicting law, including treaties. *See, e.g.*, *Medellín*, 552 U.S. at 509 n.5; *Breard*, 523 U.S. at 376. And where Congress has wished to preserve earlier agreements with other nations in the face of conflicting subsequent legislation, it has added text to that effect, which it did not do here. *See* S. Rep. No. 100-445, at 318–19 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4515, 4830 (collecting examples where Congress circumscribed scope of certain tax provisions in deference to preexisting treaty obligations); *see also* 28 U.S.C. § 1604 (stating that the Foreign Sovereign Immunities Act's baseline grant of immunity to foreign sovereigns is "[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment" of the Act); *Simon v. Republic of Hung.*, 77 F.4th 1077, 1091 (D.C. Cir. 2023) (discussing "treaty exception" text in the

Foreign Sovereign Immunities Act); *Moore v. United Kingdom*, 384 F.3d 1079, 1083–84 (9th Cir. 2004) (same).[2]

In summary, the opinion of the Court endorses an interpretation of the relevant Treaty provisions that presents an irreconcilable conflict with the later-enacted statutory CDP provisions. The opinion of the Court fails to pay due heed to the long-established rules governing the resolution of such conflicts, which dictate that the later-in-time statute applies to render the Treaty provisions null to the extent of the conflict. Given the conflict that plainly flows from the opinion of the Court's interpretation, Ms. Ryckman should be entitled to avail herself of the later enacted statutory protections Congress put in place before the IRS attempts to collect a liability by lien or levy.[3]

---

[2] In a note the opinion of the Court states that Paragraphs 2 and 3 of the Treaty here "provide (by implication) that those [CDP] prerequisites are deemed unsatisfied in the case of an accepted Canadian revenue claim." *See* op. Ct. note 11. The Treaty contains no support for this novel concept and, as we will describe below, the text of the Treaty does not support the attempt to conflate the distinct requirements of Paragraphs 2 and 3. The Court is attempting to fit the CDP regime on a procrustean bed of its own design, rather than allowing the Treaty and the regime to operate harmoniously. To the extent that they cannot (as seems to be the case under the opinion of the Court's view), the CDP regime must win.

[3] The concurrence emphasizes the importance of faithful treaty construction and suggests that this dissent fails to accord the proper deference due to the actions of the political branches. *Au contraire.* Like the concurrence, this dissent respects the political sensitivities accompanying treaties and rejoices in the splendors of our separation of powers, which undergirds our system of government. But this case does not implicate those principles. Congress's ratification of a treaty places it on par with any other law that has been passed by Congress and signed by the President, and Congress remains free to change its mind. *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land . . . ."). The political branches have underscored this point in the tax context by enacting section 7852(d)(1), which provides that "[f]or purposes of determining the relationship between a provision of a treaty and any law of the United States affecting revenue, neither the treaty nor the law shall have preferential status by reason of its being a treaty or law." *See also* S. Rep. No. 100-445, at 325, *reprinted in* 1988 U.S.C.C.A.N. at 4836 ("[T]he committee finds it disturbing that some assert that a treaty prevails over later enacted conflicting legislation in the absence of an explicit statement of congressional intent to override the treaty; that it is treaties, not legislation, which will prevail in the event of a conflict absent an explicit and specific legislative override."). *See generally id.* at 321–28, *reprinted in* 1988 U.S.C.C.A.N. at 4832–40 (discussing at length treaty-statute interactions under the U.S. Constitution, as well as common interpretive errors). Under the opinion of the Court's view of what the Treaty says, a conflict exists between

26

II.

And yet it does not have to be this way. The conflict generated by the Court's interpretation may be avoided by a better reading of the relevant Treaty provisions.

"In interpreting treaties, 'we begin with the text of the treaty and the context in which the written words are used.'" *Water Splash, Inc. v. Menon*, 581 U.S. 271, 276 (2017) (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988)); *see also Air Fr. v. Saks*, 470 U.S. 392, 396–97 (1985); *Toulouse v. Commissioner*, 157 T.C. 49, 57–58 (2021). "The plain meaning of a treaty's text controls unless its effect is contrary to the intent or expectations of the treaty partners." *Toulouse*, 157 T.C. at 57; *accord Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180 (1982); *cf. Rocca v. Thompson*, 223 U.S. 317, 332 (1912) ("[T]reaties are the subject of careful consideration before they are entered into, and are drawn by persons competent to express their meaning, and to choose apt words in which to embody the purposes of the high contracting parties.").

Treaties "are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 535 (1991) (quoting *Saks*, 470 U.S. at 396). "Because a treaty ratified by the United States is 'an agreement among sovereign powers,'" the Supreme Court has considered as "'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." *Medellín*, 552 U.S. at 507 (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996)); *see also United States v. Stuart*, 489 U.S. 353, 365–66 (1989); *Adams Challenge*, 156 T.C. at 45.

"The practice of treaty signatories counts as evidence of the treaty's proper interpretation, since their conduct generally evinces their understanding of the agreement they signed." *Stuart*, 489 U.S. at 369 (citing *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 259 (1984)). "Similarly, '[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.'" *Id.*

---

the Treaty provisions here and Congress's subsequent enactment of safeguards that click into place when the IRS collects by lien or levy. Its later choice governs.

(quoting *Sumitomo*, 457 U.S. at 184–85); *see also United States v. Global Fishing, Inc.* (*In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*), 634 F.3d 557, 568 (9th Cir. 2011). This Court has previously "found the Treasury Department's technical explanations of income tax treaties helpful in interpreting treaty provisions." *Smith v. Commissioner*, 159 T.C. 33, 39 n.11 (2022). We have likewise considered IRS guidance memoranda "to show the IRS' position." *Adams Challenge*, 156 T.C. at 43 n.14.

"Where a treaty and a statute relate to the same subject, courts attempt to construe them to give effect to both." *Toulouse*, 157 T.C. at 58; *accord Whitney v. Robertson*, 124 U.S. 190, 194 (1888); *Adams Challenge*, 156 T.C. at 44. Specifically, "[i]n non-tax contexts the Supreme Court has sought to read statutes in harmony with treaties and rejected constructions of terms that would unnecessarily create conflict between the two." *Adams Challenge (UK), Ltd. v. Commissioner*, 154 T.C. 37, 62 n.18 (2020) (citing *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 412–13 (1968) (declining to interpret a statute to abrogate hunting and fishing rights granted to Native Americans by a treaty)); *accord United States v. Payne*, 264 U.S. 446, 448 (1924) (stating that a later-enacted statute, while controlling in case of conflict, "should be harmonized with the letter and spirit of the treaty, so far as that reasonably can be done"); *Whitney*, 124 U.S. at 194 (stating that, where a treaty and legislation relate to the same subject, "the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either").

The Treaty provisions here can—and thus should—be read harmoniously with the subsequently enacted safeguards in sections 6320 and 6330. The relevant Treaty provisions contemplate a distinction between the substance of the revenue claim underlying the request for assistance and the procedures by which the claim is to be collected. The Treaty uses the law of the applicant country as to the former and the requested country as to the latter.

Paragraphs 2 and 5 of the Treaty relate to *what* is to be collected. Paragraph 2 requires that an applicant state certify that the claim is finally determined under the applicant state's own laws, which is defined to mean "when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial right of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted." Paragraph 5 then clarifies that the acceptance of the claim prohibits any merits-based challenge, providing

that "[n]othing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's finally determined revenue claim by the requested State." These provisions enshrine the law of the applicant state as governing the substantive validity of the underlying claim. *See* Treasury Department Technical Explanation of the U.S.-Canada Income Tax Treaty, as Amended by the Protocol Signed on June 14, 1983, and the Protocol Signed on March 28, 1984, at 77, https://www.irs.gov/pub/irs-trty/canatech.pdf (last visited July 23, 2024) ("Thus, when an application for collection assistance has been accepted, the substantive validity of the applicant State's revenue claim cannot be challenged in an action in the requested State."); Canada: Senate Foreign Relations Committee Report 06/13/1995 (1980 Protocol), Tax Treaties (RIA), (Westlaw 2024), RIA TAXT 1370 ("Nothing in the assistance in collection article shall be construed as creating or providing any rights of administrative or judicial review of the applicant country's finally determined revenue claim by the requested country . . . .").

On the other side of the ledger lie Paragraphs 3, 4, and 10, which address *how* the claim is to be collected. Paragraph 3 provides that, once a revenue claim of an applicant state is accepted, that claim "shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim finally determined in accordance with the laws applicable to the collection of the requested State's own taxes." Paragraph 4 puts meat on the bones, assigning the accepted claim a specific status in the requested state's tax regime. Thus, under Paragraph 4(a), a finally determined Canadian revenue claim is "treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received." For its part, Paragraph 10(b) provides that the Treaty does not "[i]mpos[e] . . . the obligation to carry out administrative measures of a different nature from those used in the collection of its own taxes or that would be contrary to its public policy." Read together, these provisions illustrate that the law of the requested state supplies the procedures governing collection.

The opinion of the Court goes astray by grafting the understanding of "finally determined" from the specific context of an applicant state's application for assistance onto the requested state's manner of collecting the claim. The definition of "finally determined" set forth in Paragraph 2 is tailored to the obligations of the applicant state and cannot be imported into the Paragraph 3 context, which deals exclusively with the conduct of the requested state. Moreover,

Paragraphs 4, 5, and 10 would seem to have little function if "finally determined" under Paragraph 3 meant that all procedural rights under the requested state's law were deemed to have lapsed and been exhausted. And the opinion of the Court's approach would appear to give priority to a revenue claim from Canada in contravention of Paragraph 7, with the removal of CDP procedures ostensibly allowing a Canadian claim to cut ahead of a U.S. counterpart that must comply with such procedures.

The most apt reading of the relevant provisions together is that the exhaustion text of Paragraph 2 is confined to that Paragraph and that the normal collection procedures of the requested state apply.[4] Under this reading, there is no conflict with the CDP safeguards, including the requirements of a hearing and judicial review.

The postratification actions of the implementing agency provide support for this view. The IRS considered the interplay between the Treaty and the CDP procedures in 1999, taking the position (in a nonprecedential memorandum) that "sec. 6330 applies to treaty levies but that only issues concerning the Service's administrative collection procedures (e.g., challenges as to whether the procedural requirements have been met for the Service's use of summonses, liens, and/or levies) and not issues concerning the liability itself, may be raised at a hearing." I.R.S. Chief Couns. Adv. Mem. 199939034, 1999 WL 779472 (Oct. 1, 1999).[5]

The opinion of the Court attempts to refute this point by noting that the IRS switched positions six years later, citing *Internal Revenue Manual* provisions offering administrative options rather than the CDP regime with respect to the Treaty. *See* op. Ct. note 7. This course of conduct undermines, rather than bolsters, the opinion of the Court's interpretation of "finally determined." That interpretation is premised on the Treaty's purported foreclosure of "all *administrative* and judicial

---

[4] Although Paragraph 2 prefaces the definition of "finally determined" with the phrase "[f]or the purposes of this Article," this definition is inherently limited to a revenue claim of an applicant state by its own text, which exclusively refers to rights in an "applicant state." This reading does not render the introductory phrase surplusage as the concept of a revenue claim of an applicant state being "finally determined" recurs in Paragraphs 3 and 5.

[5] We have previously considered such nonprecedential memoranda "to show the IRS' position." *Adams Challenge*, 156 T.C. at 43 n.14.

rights." The IRS plainly does not see it that way, as it has offered first judicial, then administrative, processes since at least 1999.

The Government's approach to a similar Collection Assistance provision in the tax treaty with Japan, another close treaty partner, sheds further light. *See* Treasury Department Technical Explanation of the 2013 Protocol Amending the U.S.-Japan Income Tax Treaty 23, https://home.treasury.gov/system/files/131/Treaty-Japan-Pr2-TE-10-29 -2015.pdf (last visited July 23, 2024). This technical explanation states that "Paragraph 5 requires the applicant State to certify that the revenue claim for which collection assistance is sought has been 'finally determined,'" a term defined in the same manner as in the 1995 protocol to the Treaty at issue in this case. The technical explanation goes on to clarify that neither CDP rights in the United States nor certain rights under Japanese law (dating to 1962) preclude a revenue claim from being "finally determined" under the relevant law. Although the opinion of the Court goes to great lengths to point out differences between the Treaty here and the treaty with Japan, *see* op. Ct. note 12, it misses the key lesson from the Japanese treaty: The postratification conduct suggests that the United States has embraced the notion that CDP rights happily coexist with a "finally determined" claim, which is the result the text read harmoniously supports here.

The opinion of the Court objects, however, that this result would grant two bites at the procedural apple—first in Canada and then in the United States. *See* op. Ct. pp. 13–14. The Treaty allows for just that, and it makes sense to do so. The Treaty is structured to ensure that, before requesting assistance, the applicant country exhausts all remedies available to it. One can well understand why sovereign nations would wish certitude before entertaining an application for collection assistance. *See, e.g.*, Richard E. Andersen, *Andersen Analysis of United States Income Tax Treaties* ¶ 24.03[1][b][ii] (2010) ("In accordance with th[e] doctrine [of the revenue rule], . . . the United States typically does not assist another country in the collection of taxes."). Although the opinion of the Court reflects an ostensible belief that the exhaustion of remedies in Canada should count as the exhaustion of remedies in the United States, this position lacks any support in the Treaty, which establishes that the law of the requested state governs collection procedures, or from Congress, which has not seen fit to strip away American procedural safeguards where a close Treaty partner has conducted its own proceedings.

The opinion of the Court also observes that it would be passing strange for the IRS to be in the position of verifying requirements of Canadian law or to grant a collection alternative. It is not odd, however, for sovereign nations to respect and abide by each other's collection procedures. The practical concerns recited by the opinion of the Court are mole hills, nothing more. Verification in this context would be accomplished by confirming that an application was properly made under the Treaty. And the grant of a collection alternative would not compromise Canada's tax claim but merely represent the IRS's best judgment as to what part of the claim may be collected and which collection mechanisms the United States will employ to do so.

To sum up, the Treaty can be harmonized with the later enacted CDP safeguards in sections 6320 and 6330. Under a correctly harmonized view, Ms. Ryckman is entitled to the protections outlined in those sections before the IRS moves to collect by lien or levy.

BUCH, PUGH, ASHFORD, TORO, and WEILER, *JJ.*, agree with this dissent.